(No. 31824.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DOROTHY SKEOCH, Plaintiff in Error.

*Opinion filed January 18, 1951.*

FERLIC & CANNON, of Chicago, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, and EDMUND GRANT, all of Chicago, of counsel,) for the People.

Mr. JUSTICE CRAMPTON delivered the opinion of the court:

Plaintiff in error, Dorothy Skeoch, hereinafter referred to as defendant, was convicted of the crime of murder after a trial by jury in the criminal court of Cook County, and was sentenced to the penitentiary for a term of fourteen years. Her defense was that of insanity.

The evidence discloses that on August 18, 1949, at about 9:40 P.M., defendant came to a neighbor's door, which adjoined her two-room apartment. She was crying and sobbing, and appeared to be hysterical. She asked her neighbor for help, saying there was something wrong with her baby. The neighbor accompanied her back to the apartment and saw the baby lying on the bed with a plastic diaper tied very tightly around its neck and covering its mouth. Defendant fell to the floor, crying and complaining about a colored man who had demanded money and had taken her watch. Another neighbor was summoned, who removed the diaper and attempted to revive the baby. After the fire department and a doctor arrived, the child was found to have died from asphyxiation or strangulation. Police officers, who arrived about 10:45 P.M., were told by defendant that some colored man had threatened that if she didn't give him some money he would take her baby, that she then fainted, and that when she regained consciousness her wrist watch had been removed and the baby was lying with the diaper around its neck. While she was being questioned a police officer discovered the watch in a suitcase, and defendant, upon being shown the watch, ad-

mitted that she tied the diaper around the baby's neck and that the story about the colored man was untrue.

Defendant thereafter signed a statement relating that when she went in to feed the baby it was fussing and crying, that she tied the diaper around its neck and pulled it tight, and that after realizing what she had done she conceived the story which she had first told the police. A second confession was made the next day, when she confessed to killing the baby because of serious financial situation of her husband and herself, strained relations between herself and her parents, who disapproved of her marriage, and her husband's inability to keep a job. The baby had been born only six days prior to its death.

In view of the nature of the defense some reference must be made to other facts disclosed by the evidence. The defendant, a young woman twenty-two years of age, had been married little more than a year. She was an only child, and prior to her marriage had resided with her parents in a large home at Astoria, Oregon. A high school graduate, she had spent some time in college, had been an excellent student, and possessed a very good reputation as a truthful and law-abiding citizen. During the war she was employed as a hostess at a servicemen's center in Oregon, where she met her husband, a member of the armed forces. She married him over objections by her parents. Her mother, upon learning of the marriage, became extremely angry, to the extent of actually making a physical assault on the daughter and her husband. The mother thereafter refused to speak to defendant, although she later sent some money to her from time to time in response to appeals by defendant.

Soon after the marriage defendant and her husband moved to Chicago, where they lived for part of the time with the husband's parents and the rest of the period in a two-room apartment. Defendant secured employment for about 2½ months. Her husband failed to keep any

steady employment, holding some six successive positions during the year since they moved to Chicago. In each case he either resigned the job or was discharged, usually remaining idle for two or three weeks thereafter. During one of his periods of employment, while working as a substitute mail carrier, he was convicted of a Federal offense and placed on probation. About a month before her pregnancy defendant was attacked by a colored man on the street, incurring bruises and lacerations. Prior to the birth of her child defendant wrote a letter to her parents in which she indicated she was despondent over their financial condition, and in which she declared "Sometimes I feel like turning on the gas and forgetting everything." On August 18, 1949, when defendant left the hospital where the baby was born, her husband had been without employment for about six weeks. She was discharged from the hospital about 12:30 P.M. Her husband and mother-in-law were with her until about 9:30 P.M., when the husband left to take the mother-in-law home.

Defendant's husband testified on her behalf that after he became involved in difficulties at the post office and was arrested, his wife became upset and depressed; that she was moody and frequently cried. He further testified he observed a change in her after she went to the hospital for the birth of the child. She talked very little, appeared to be concentrating on something, would not speak unless she was spoken to, and was very quiet and depressed. Her mind "seemed to be somewhere else." The witness further stated that from his observation of defendant on the day she returned from the hospital he formed an opinion as to her sanity; and that in his opinion she was insane. On cross-examination he testified that he formed the opinion a few days later and that he did not have it on August 18, 1949. The court then granted a motion to strike the testimony concerning the opinion. Defendant's mother-in-law testified she saw defendant at the hospital on August 18,

that defendant did not respond to questions and had nothing to say, and that this was unusual for her. The witness felt something was wrong. A qualified neurologist and psychiatrist testified in response to a hypothetical question, that in his opinion defendant was insane on August 18, 1949,—that she was suffering from post partum psychosis with infanticide, a mental disorder which frequently occurs with the delivery of a child. He further testified that a sudden shock could cause a return to normalcy, and that in his opinion defendant was normal at the time of the trial. No evidence was offered by the State to prove defendant was sane at the time the act was committed.

In support of the conviction the State relies upon the presumption of sanity, and maintains that defendant failed to introduce sufficient evidence to rebut it. We think this position is not sustained by the record. Under the law of this State the presumption is overcome by evidence, tending to prove insanity of the accused, which is sufficient to raise a reasonable doubt of sanity at the time of the commission of the act for which the accused is sought to be held accountable. When that is done the presumption of sanity ceases and the prosecution is then required to prove the sanity of the accused beyond a reasonable doubt, as a necessary element of the crime charged. (*People* v. *Patlak,* 363 Ill. 40; *People* v. *Casey,* 231 Ill. 261, 266-267.) The testimony of defendant's husband and the expert testimony of the psychiatrist, when considered in the light of other evidence as to her behavior on the day in question and as to external circumstances of a type likely to cause mental and emotional strain, were sufficient, in our opinion, to raise a reasonable doubt of her sanity. The prosecution then had the burden of proving beyond a reasonable doubt that the defendant at that time had sufficient mentality to distinguish and choose between right and wrong as to the particular act. This it failed to do.

Moreover, the court erroneously instructed the jury that "in order to find the defendant not guilty on the ground of insanity, such insanity must be so clearly proven as to raise a reasonable and well-founded doubt of defendant's guilt when the whole evidence is taken together." An almost identical instruction was condemned by this court in *People* v. *Krauser,* 315 Ill. 485, 517, where we observed: "The use of the words 'clearly proven,' in the instruction, was erroneous. So was the use of the word 'well-founded' in connection with reasonable doubt. * * * The law gives the defendant the right to an acquittal if there is a reasonable doubt of his guilt. If a reasonable doubt actually exists, it is sufficient whether well or ill-founded." The People concede that the instruction was erroneous but urge nevertheless that defendant was not prejudiced because "insanity on the part of the accused was not made to appear by the evidence upon the defense." In view of our conclusion that defendant's evidence sufficiently tended to prove insanity so as to overcome the presumption, this contention is clearly without merit. However, defendant's brief and abstract do not state at whose request the instruction was given. Nor does the abstract of the record incorporate all of the instructions given by the court. The assignment of error in this respect cannot, therefore, receive further consideration.

Other alleged errors are assigned which it is unnecessary to discuss.

For the failure of the prosecution, after the presumption of sanity was overcome by defendant, to prove her sanity beyond a reasonable doubt, the judgment of the criminal court will be reversed and the cause remanded to that court for a new trial.

*Reversed and remanded.*