THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HAROLD ELLIOTT, Defendant-Appellant.

(No. 74-383;

Fifth District—October 1, 1975.

Stephen P. Hurley and Daniel M. Kirwan, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Nicholas G. Byron, State's Attorney, of Edwardsville (Bruce D. Irish and Raymond F. Buckley, Jr., both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE KARNS delivered the opinion of the court:

Defendant-appellant Harold Elliott was convicted of aggravated kidnapping and deviate sexual assault after a jury trial in Madison County and was sentenced to serve concurrent terms of from 10 to 20 years' imprisonment. On appeal, he contends that he was not proved guilty beyond a reasonable doubt in that a reasonable doubt existed as to his

sanity, that convictions and sentences for two offenses arising from a single course of conduct were improper, and that the sentences are excessive.

Because the defendant does not contest the facts of the incident upon which the prosecution was based, we need not discuss the facts in detail. Suffice it to say that the incident involved the abduction and assault by the defendant of an eight-year-old girl. Other facts will be supplied where necessary.

At trial, defendant's only defense was that of insanity. Section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 6—2) states:

> "(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
>
> (b) The terms "mental disease or mental defect" do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

The issue was further narrowed by defendant's concession that he understood the criminality of his conduct. Thus, at issue was solely the question whether defendant was capable of conforming his conduct to the requirements of the law. The defense case consisted primarily of the testimony of the defendant and two psychiatrists. While serving as a minister, defendant had a brief extramarital affair with a parishioner. Shortly thereafter, he began to expose himself to women and eventually began to molest young girls, offenses for which he was convicted in New York. This conduct was remarkably similar to the instant offense. Defendant served part of a penitentiary sentence and was sent to a State hospital where he remained for four years. Upon his discharge he was allowed to leave New York and come to Illinois where during the remainder of his probationary period he was treated by Dr. Warren Hempel, one of the psychiatrists who testified at the trial. The instant offense occurred about two years after he stopped seeing Dr. Hempel and was apparently the first such conduct since defendant was convicted and confined in New York in 1967. He testified that the night before the offense he was agitated and upset because of an argument with his wife. The next morning he attempted to perform odd jobs around the house but became more and more upset. He left the home, driving his truck across the lawn because his wife had parked her car behind his truck in the driveway to keep him fom leaving, and drove to a shopping center parking lot to sit and think. He testified that he was very depressed and wanted to "die" or "disappear." At this point, defendant

stated that he began to feel a "roaring" in his head and a tingling sensation in his body. According to defendant, it was the same sensation he had felt prior to the commission of his prior offenses. He drove to a drug store and bought two magazines with pictures depicting naked women, then drove to a residential neighborhood where he encountered two young girls. He showed the girls the pictures and asked if they could help defendant locate the women. One girl fled, but the other, the complainant, entered defendant's truck. They drove around the area for a while, then turned into a side road leading away from the residential area, where defendant parked the truck. Defendant testified that although his head was "full of noises, a voice screaming inside of me stop," he "calmly" proceeded. During the assault he noticed a vehicle behind him. He had the girl dress and drove further down the road and eventually pulled off and stopped. He released the girl when two men approached the car, then began to cry and beat his head against the steering wheel. He sat that way until the State Police arrived. Notable about defendant's testimony is the almost total recall of his movements, including such things as the routes he took, his intricate maneuvering to park next to the girls on the street, and the words spoken by him and the complaining witness. But he did not testify about using threats to get the girl in the car or forcing her to sit on the floor to avoid being seen or threats employed to force the girl to commit the act. All of these matters were established by the complaining witness and all circumstances but the commission of the act itself were corroborated by others. Furthermore, defendant's testimony was that the girl refused to perform the act and that the assault was therefore not completed. While there is no doubt that the evidence was sufficient to convict, these material discrepancies in the testimony may have influenced the jury in its determination of defendant's mental state.

Dr. Warren Hempel was the first psychiatrist to testify. He had treated defendant for several months during 1971 and early 1972 and saw him again after the instant offense had occurred. Besides his own examination of the defendant, he had read and was apparently familiar with the history of defendant's treatment in New York. Hempel stated that, in his opinion, considering defendant's education and ability to distinguish right from wrong, the commission of the offense exhibited "totally irrational behavior." Further, it was his opinion that defendant was "unable to control his behavior" at the time, that defendant's behavior was "crazy" and that defendant was "psychotic." Dr. Hempel was reluctant to specify defendant's exact mental illness but described defendant as "schizophrenic" and "immature." He later stated that defendant was still in need of psychiatric treatment, that defendant suffered from a

"personality disorder," described by Hempel as being "about a half dozen things listed in the book," "immature personality," "symptoms of schizogonic personality," and "passive aggressive personality." On cross-examination, Hempel admitted that several schools of thought existed in psychiatry and that different opinions and terms might apply to individual patients.

Dr. Nathan Blackman had examined defendant three times subsequent to the offense. He also took a personal history from defendant and reviewed the New York findings. He described defendant's relation of fantasies and the increasing "momentum" of the decision to molest a child, culminating in the deafening roar and resulting in a "preoccupation which he couldn't stop or which he couldn't control in any way." Blackman stated that defendant suffered from a "severe obsessive compulsive neurosis," "with evidence of depression, with evidence of paranoid thinking which at the time the event happened made it impossible for him to change the course of his behavior" and that defendant was "unable to resist the pursuit of his obsessive thinking." Blackman stated that defendant still suffered from mental illness and required psychiatric treatment but that defendant was not a psychopath, which he defined as one repeatedly in conflict with the law. He described defendant's acts as a "ritual" during which defendant expected and sought to be punished. On cross-examination, Blackman referred to "a chain of things" which would cause stress and trigger regressive behavior in the defendant. He stated that he reviewed the New York reports which concluded that defendant was schizophrenic in 1966 but stated that he did not consider him so in 1974. He again described the "ritual" as "obsessive compulsive" behavior. Blackman admitted that defendant's behavior constituted a sexual deviancy but denied that such diagnosis was inconsistent with obsessive compulsive neurosis. The State was allowed to have Blackman identify a standard textbook which Blackman admitted did not consider sexual deviation an obsessive compulsive neurosis. Blackman also stated that he did not consider it "significant" that defendant had not told him about any threats used against the girls or of the completion of the assault.

Dr. Jack Croughan testified in rebuttal for the State. He stated that he had reviewed the New York records and, by stipulation, had been present in the courtroom during Dr. Blackman's testimony, but that he had interviewed the defendant only once, for about an hour in the courthouse the morning of the trial. The history given Croughan by defendant did not differ significantly with that related by Blackman. Croughan, however, diagnosed defendant's condition as sexual deviation, more specifically pedophilia, a personality disorder not classed as either neurotic or

psychotic. He stated that pedophiles generally are able to discern right from wrong and "should be" able to conform their conduct to the law. Croughan stated that in his opinion defendant still suffered from the disorder. On cross-examination, Croughan testified that defendant had told him that he was not able to resist his impulses on the day of the offense and that no objective method existed to test that statement. Croughan stated that most pedophiles were "chronic" repeaters and did not resist their impulses, but again stated that the present state of psychiatric advancement was unable to determine objectively if they could. According to Croughan, the deafening noises heard by defendant were not symptomatic of a particular mental illness and defendant did not display usual symptoms of depression. Croughan stated specifically that pedophilia is not an obsessive compusive neurosis in psychiatric terms although the impulses resulting from the disorder may be compelling to the individual. He disagreed with Dr. Blackman that obsessive compulsive behavior could occur in an "episodic" manner, stating that the occurrences would be more frequent and regular.

The defense stipulated that the testimony of a Dr. Datuin would be the same as that of Dr. Croughan.

The jury was instructed on the appropriate definitions of insanity (Ill. Rev. Stat. 1973, ch. 38, par. 6—2, Illinois Pattern Jury Instructions, Criminal, 24.01, 25.01) and on the State's burden of proving that defendant was sane.

■■ There can be no doubt that where the defendant has properly submitted evidence that he is insane, it is incumbent that the State prove beyond a reasonable doubt that he is sane. (*People v. Redmond*, 59 Ill.2d 238, 320, N.E.2d 321 (1974).) The State did not contend at trial nor does it contend here that the evidence of insanity was not sufficient to be presented to the jury. As the defendant concedes, however, a mere personality disorder is not sufficient to constitute a "mental disease or defect" under section 6—2 of the Criminal Code. (*People v. Gold*, 38 Ill.2d 510, 232 N.E.2d 702 (1967).) In the instant case, the jury had before it conflicting testimony by psychiatrists, none of whom, including Hempel, had treated defendant recently and extensively. The jury also heard and saw the defendant testify clearly and in great detail about his background, his long period of apparent recovery, and the incident in question including, of course his apparent omission of the most damaging facts. Furthermore, the evidence showed at least a semblance of a plan or design by which the offense was to be committed. Defendant drove to a town other than that in which he lived, stopped at a store to buy the magazines, drove to a residential neighborhood, and later concealed or attempted to conceal the victim from view both at the

time of abduction and capture. (*See People v. Burress,* 1 Ill.App.3d 17, 272 N.E.2d 390 (1971).) The record demonstrates that defendant terminated his criminal activity when he saw in the mirror of his truck that his captors were approaching. We consider this as evidence that he both appreciated "the criminality of his conduct" and that he could control himself. The issue of insanity was properly and forcefully argued before the jury and the jury was properly instructed on the law. The question was one of fact for the jury and we will not disturb its finding "unless it is so manifestly against the weight of the evidence as to indicate the verdict was based on passion or prejudice." (*People v. Ford,* 39 Ill.2d 318, 321, 235 N.E.2d 576, 578 (1968); *People v. Felton,* 26 Ill.App.3d 395, 398, 325 N.E.2d 400, 402 (1975).) Although both parties readily concede that defendant is in need of psychiatric care, we cannot find as a matter of law that the defendant was insane.

■■ Defendant next contends that one of the two Class 1 felonies for which he was convicted must be reversed because the two offenses arose from a single course of conduct. We have recently discussed the morass of decisions concerning this issue and the apparent lack of statutory authority for the rationale (*People v. Binkley,* 25 Ill.App.3d 27, 322 N.E.2d 514 (1975)) and do not believe it necessary to reiterate our opinion upon the subject. (See also Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—4.) The latest pronouncement of the Supreme Court about offenses such as those charged here is *People v. Canale,* 52 Ill.2d 107, 285 N.E.2d 133 (1972), in which the court rejected the argument that the secret confinement of the victim was merely "incidental" to a subsequent rape and deviate sexual assault. The court approved concurrent sentences imposed for rape and aggravated kidnapping. This rationale has been followed by appellate courts. (*People v. Pardue,* 6 Ill.App.3d 430, 286 N.E.2d 29 (1972); *People v. Rieffer,* 30 Ill.App.3d 561, 333 N.E.2d 639 (1975).) Defendant cites *People v. Sims,* 20 Ill.App.3d 1068, 313 N.E.2d 663 (1974), in which the Fourth District Appellate Court refused to allow conviction and sentence for both rape and aggravated kidnapping. That decision, however, appears to ignore the holding in *People v. Canale,* and cannot here be approved. We find that no error was committed in the sentences for aggravated kidnapping and deviate sexual assault.

Defendant finally argues that the sentence of from 10 to 20 years is excessive. There can be no doubt that defendant Elliott is in need of close supervision and extensive psychiatric treatment. The entire record of the sentencing proceedings reflects the concern of the court and attorneys for both sides for disposition which would provide the necessary help for the defendant. The record further discloses that after the last

extensive incarceration of the defendant in New York, both in prison and in a State hospital, defendant returned to a peaceful and acceptable existence for a period of years but reverted to prior conduct with resultant consequences. Defendant's wife testified at the hearing that she had visited the prison where her husband expected to be incarcerated and was satisfied that he could receive proper treatment there. The court noted the indeterminate nature of the sentence imposed and specifically ordered the State's Attorney to convey to the Department of Corrections the court's belief that defendant was in need of treatment and the request that defendant be assigned to the psychiatric division of Menard Penitentiary. We can in no way say that the court abused its discretion in imposing sentence.

The judgment of the Circuit Court of Madison County is affirmed.

Affirmed.

EBERSPACHER and G. MORAN, JJ., concur.