THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LARRY D. SPEARS, Defendant-Appellant.

Fifth District   No. 76-430

Opinion filed August 4, 1978.

G. MORAN, J., dissenting.

Michael J. Rosborough and A. Michael Kopec, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Nicholas G. Byron, State's Attorney, of Edwardsville (Bruce D. Irish and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, and David Y. Eberspacher, research assistant, of counsel), for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Defendant-appellant Larry D. Spears was charged by indictment with armed robbery and attempt murder in violation of sections 8—4(a) and 18—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, pars. 8—4(a), 18—2(a)). Defendant was found guilty by a jury on June 16, 1976 and was sentenced to concurrent prison terms of 7 to 21 years on each offense. Defendant contends on appeal that the State failed to meet its burden on the issue of defendant's sanity at the time of the offense and that he was denied a fair trial as a result of prejudicial remarks and incorrect statements made by the prosecution during closing arguments. Defendant also argues that he should have been given sentence credit for the period he spent in Federal institutions by reason of his unfitness to stand trial in Federal court for the same offense.

Defendant was arrested on August 6, 1973, by the East Alton police for robbing the State Bank of East Alton and shooting a bank guard during the course of the robbery. Defendant was released to the custody of the

F.B.I. in order to stand trial on Federal charges stemming from the bank robbery. Defendant refused to speak during his arraignment and preliminary hearing on the Federal charges and on September 21, 1973, the United States District Court for the Southern District of Illinois ordered defendant committed to the Federal Medical Center in Springfield, Missouri, for a determination of his competency to stand trial. A psychiatric evaluation made by the staff of the Federal Medical Center found that defendant was presently mentally ill and incompetent to stand trial. On February 22, 1974, the District Court found defendant Spears mentally incompetent to stand trial and committed the defendant to the Federal Medical Center in Springfield until such time as he became competent to stand trial or until an alternative disposition was reached. Later psychiatric evaluations concluded that Spears was still incompetent to stand trial and recommended long term hospitalization. The Federal charges against Spears were dismissed by the United States Attorney for the Southern District of Illinois on December 12, 1975, in view of defendant's incompetency to stand trial.

Defendant Spears was charged by indictment in Madison County with armed robbery and attempt murder on December 11, 1975. Defendant pleaded not guilty to these Madison County charges and filed a motion requesting a determination of his competency to stand trial. Pursuant to court order defendant was examined on January 28, 1976, by Dr. John Goldsborough who determined that Spears was suffering from schizophrenia in a partial state of remission and that he could cooperate with an attorney in his own defense. The case was set for trial on June 14, 1976.

The State presented several witnesses for purposes of identifying defendant and describing his behavior on the day of the robbery and shooting.

Lydia Heathcott, a teller at the Illinois State Bank of East Alton, testified that defendant stepped up to her cage, placed a valise on the counter and told her to fill it with money. When she responded by grinning or giggling, defendant peeled back part of the valise and drew her attention to a gun inside it which he had pointed at her. There were no policemen or security guards in sight. As she began to push bundles of money across the counter towards Spears, she turned and looked at the nearest bank employee in an attempt to attract his attention to her predicament. Defendant responded by warning her not to look at anyone, and when she attempted to pass him her smaller denominations of bills, he demanded bigger bills.

Robert Green, the bank security guard, testified that he was quickly informed of the robbery and that he ran out of the bank shouting at defendant to halt. Green stated that Spears did not halt but instead ran

behind his car, levelled a gun across the top of the car and opened fire at the guard. One of the shots grazed him on the ribs. Green returned the fire and managed to get around the back of defendant's car and shoot Spears in the leg. The guard then took the defendant's empty gun and ordered him to put his hands on the car and "spread eagle out." The defendant followed these instructions. After he was subdued Spears did not say anything except to agree with Green's comment that defendant was a lousy shot.

The arresting officer, Dennis Childs, testified that while he was with defendant at the bank and at the jail, Spears followed instructions and appeared normal but did not say a word. He seemed to stare most of the time. The only exchange between them was when defendant thanked Childs for bringing a cup of coffee to his cell.

After the prosecution rested its case, defense counsel read the four psychiatric and psychological evaluations from the Federal Medical Center made between 1973 and 1975 into the record on stipulation of the State's Attorney. These staff reports indicated the examiners' opinion that defendant was suffering from paranoid schizophrenia with little chance of recovery and that he was in need of long-term hospitalization. The most specific report was the third in the series, a psychological report dated April 8, 1975. In that report, defendant Spears was described as fairly neat in appearance and polite. He spoke easily and displayed a sardonic smile at appropriate times. His statements were coherent, well phrased and articulate. The interviewer stated that Spears claimed an inability to remember the bank robbery except in disconnected flashes and that upon further questioning, he suggested that his behavior may have been controlled by a small radio device that moved about in his alimentary canal. Spears stated that the device was not affecting his behavior any longer. The psychologists concluded that Mr. Spears was of superior intelligence but was suffering from a serious disturbance of his emotional thought processes.

The United States Magistrate who had authorized the Federal arrest warrant for Larry Spears testified that, except for stating his name, the defendant had remained completely silent during the hearing on the warrant and at a later meeting in the magistrate's office at which he was represented by counsel.

Michael Urban, an East Alton police officer who was with Spears from the time of the arrest until after booking, testified that defendant did not speak for the entire time except to say "thank you" to Urban for his offer to get medical assistance for defendant's leg. It was Urban's impression that Spears had been booked "many, many times" before and was refusing to speak in order to give the police a hard time.

The next defense witness was Dr. John Goldsborough, a specialist in

neuropsychiatry, who described his assessment of defendant's mental condition based on an examination made at the Madison County jail on March 28, 1976, pursuant to an order of the circuit court. Dr. Goldsborough's diagnosis was that defendant was suffering from paranoid schizophrenia and was subject to severe depression. At the time of the March 28 examination Dr. Goldsborough did not have any information regarding defendant's medical history, but prior to trial the doctor learned that Spears had spent 17 days in a California mental institution after attempting suicide in 1970. Dr. Goldsborough testified that this history seemed to be compatible with what he had found during the 1976 examination and might indicate that Spears had been schizophrenic for at least 6 to 7 years. Dr. Goldsborough expressed a suspicion that had defendant seen a psychiatrist in 1969, he would have been diagnosed as schizophrenic. Dr. Goldsborough stated that a person subject to a schizophrenic process may hallucinate and hear voices which may advise him to take action which normally would be inappropriate, inadvisable or even illegal. The doctor added that paranoid schizophrenics usually suffer from delusions, paranoid fears and depression which impair good judgment and that if Larry Spears was suffering from schizophrenia at the time of the bank robbery, his judgment would have been so impaired that he would not have been totally aware of the criminality of his conduct. On cross-examination Dr. Goldsborough testified that he had no way of determining beyond a doubt that defendant could not have appreciated the criminality of the robbery and shooting on August 6, 1973. He said that the schizophrenic process is subject to partial remission and that it is possible that Spears did appreciate the criminality of the robbery and shooting on the date in question.

The testimony of defendant Spears, which was later corroborated by a presentence investigation and report, indicated that Spears had earned a B.A. and an M.S. in physics and a law degree. He had also completed substantial work on a Ph.D. in physics at the University of Arizona. Defendant had been married and had one child, but was divorced while he was attending law school. Defendant left Arizona and went to California in 1970 where he attempted suicide by cutting his wrists and spent 17 days in a State mental institution.

The release summary of that institution indicates that defendant was discharged as not mentally ill. The report indicated further that defendant did not show any evidence of psychosis and that he was diagnosed as suffering from a moderate form of depressive neurosis.

After defendant was discharged from the California mental institution, he returned to Arizona. Defendant re-enrolled at the university in order to

earn enough money through a teaching assistantship to pay for his passage to Europe. In late 1970 he went to Spain. While there, his money ran out and he took a job assisting in the running of a restaurant. Defendant then moved to Germany, where he worked as an electrician for approximately 1½ years. In March of 1973, he was apparently arrested and then deported to the United States. Defendant testified that it was his intention to be deported so he could return home. Following his return to the United States, defendant lived with his mother in Decatur, Illinois, and worked at part-time jobs until the time of the bank robbery. Defendant further testified that he could not remember anything about the bank robbery or shooting except riding in the ambulance. He did remember buying the gun he used in the robbery, but did not remember any of the officers who testified against him.

At the close of the defense's case, an instruction conference was held in the judge's chambers during which the trial judge found that the defendant had presented sufficient evidence to raise the issue of insanity.

The State presented two witnesses in rebuttal of defendant's evidence of insanity. Dr. James Hart, who treated defendant for the gunshot wound in his leg, testified that Spears had no problem following directions, that he responded appropriately to all the doctor's questions and that there did not appear to be anything unusual about his behavior. Dr. Hart had no expertise in psychiatry or mental disorders and on cross-examination stated that he had no opinion as to the defendant's mental condition.

The State's second rebuttal witness, F.B.I. agent Cecil Bond, questioned defendant at the East Alton police station and accompanied him on the ride to the Federal magistrate's office in Alton. Agent Bond testified that the defendant was completely silent at the police station and refused to respond to any questions except to point to a statement on the interrogation form which stated that he had a right to remain silent. Bond also testified that during the automobile ride to the magistrate's office Spears expressed surprise when he was informed that he could post bond for armed robbery.

After the State completed its case in rebuttal, defendant moved for a directed verdict of not guilty by reason of insanity. The court denied the motion and submitted the case to the jury.

The jury then found defendant guilty of both armed robbery and attempt murder and defendant received concurrent sentences of 7 to 21 years for each offense.

Section 6—2 of the Criminal Code of 1961 provides the following definition of the affirmative defense of insanity:

"(a) A person is not criminally responsible for conduct if at the

time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." Ill. Rev. Stat. 1975, ch. 38, par. 6—2.

■■ A defendant is thus relieved of criminal liability if at the time of the offense a "mental disease or defect" prevented him from appreciating the wrongfulness of his conduct or from conforming his actions to the requirements of law. This formulation of the insanity defense is based on the test established by the American Law Institute in the Model Penal Code (A.L.I. Model Penal Code §4.01 (1962)), and differs from early formulations of the insanity defense in several important respects. The present test is based on a determination of substantial incapacity to appreciate the wrongfulness of particular conduct in contrast to an earlier Illinois rule which required a finding of total incapacity to know that certain conduct was wrong. (See *People v. Lowhone*, 292 Ill. 32, 126 N.E. 620.) In addition, substitution of the word "know" with the term "appreciate" reflects an attempt to adapt the formulation of the insanity defense to new developments in modern psychiatry and to provide some flexibility in the permissible scope of expert testimony. (See *People v. Ehrler*, 114 Ill. App. 2d 171, 184, 252 N.E.2d 227; Ill. Ann. Stat., ch. 38, par. 6—2, (Smith-Hurd Committee Comments, at 326-30, 1972).) Finally, section 6—2 adopts the position of earlier tests that either an impairment of cognition or an impairment of volitional capacity may prevent an individual from conforming his actions to the requirements of the law and therefore give rise to a defense of insanity. The principal question raised by an assertion of the insanity defense, then, is "whether defendant's incapacity proceeds so far as to render him incapable of 'conform(ing), his conduct, to the requirements of the law.'" (Committee Comments at 329.) Thus, although an accused understood the nature of his conduct and appreciated its wrongfulness, he will be excused from criminal liability if his ability to consciously refrain from the conduct was substantially impaired by a mental defect. See *People v. Bender*, 20 Ill. 2d 45, 169 N.E.2d 328.

■■ The defense of insanity must be raised by an accused at trial by a presentation of evidence sufficient to overcome a presumption of sanity during the commission of a crime which automatically attaches to a criminal defendant. (*People v. Yonder*, 44 Ill. 2d 376, 256 N.E.2d 321, *cert. denied*, 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094.) The defendant's burden of raising the issue of insanity at trial and the State's burden of proving defendant's sanity have been the subject of several

Illinois Supreme Court opinions. In *People v. Skeoch*, 408 Ill. 276, 96 N.E.2d 473, the court held that the presumption of sanity could only be overcome by evidence which is sufficient to raise a reasonable doubt as to a defendant's sanity at the time of the offense. The supreme court also held that once a defendant meets this burden, the State "is then required to prove the sanity of the accused beyond a reasonable doubt, as a necessary element of the crime charged." (408 Ill. 276, 280.) In *People v. Childs*, 51 Ill. 2d 247, 256, 281 N.E.2d 631, the court apparently eased defendant's burden in holding that the burden shifts to the prosecution to prove defendant's sanity beyond a reasonable doubt if the defense introduces "some evidence * * * which raises a doubt as to defendant's sanity at the time of the alleged offense." (51 Ill. 2d 247, 256.) However, in *People v. Smothers*, 55 Ill. 2d 172, 174, 302 N.E.2d 324, the court once again held that in order to raise the issue of insanity, a criminal defendant must present sufficient evidence to raise a reasonable doubt as to his sanity at the time of the offense. This position was affirmed in *People v. Redmond*, 59 Ill. 2d 328, 320 N.E.2d 321, and it is now clear that once a defendant presents sufficient evidence to raise a reasonable doubt as to his sanity at the time of the offense the State must prove defendant's sanity beyond a reasonable doubt, as a necessary element of the case.

At the close of defendant's case the trial court ruled that the defense had met its burden of raising a reasonable doubt as to defendant's sanity. The case was then submitted to the jury which found the defendant guilty of both charges.

■■ The principle issue on appeal is whether the State proved beyond a reasonable doubt that defendant was legally sane at the time of the offense. As a general rule, the question of defendant's sanity at the time of the offense is a question of fact for the jury and a jury's finding on the issue of insanity will not be disturbed unless it is so manifestly against the weight of the evidence as to indicate the verdict was based on passion or prejudice. (*People v. Ford*, 39 Ill. 2d 318, 235 N.E.2d 576.) We must also note, however, that once a defendant has met his burden of raising the issue of insanity, the State must prove defendant's sanity beyond a reasonable doubt as a necessary element of the offense. Our review of a jury's finding on the insanity issue is thus subject to the standard generally applicable to jury verdicts in criminal cases. We therefore must affirm defendant's conviction unless we find that the jury's verdict was so against the weight of the evidence as to raise a reasonable doubt of defendant's sanity at the time of the offense or indicate that it was the result of passion or prejudice.

Defendant relied primarily on the testimony of Dr. John Goldsborough and the results of psychiatric evaluations conducted by the staff of the Federal Medical Center in asserting the insanity defense.

■■ We note at the outset that a jury is not required to accept the conclusions of a psychiatrist (*People v. Greenfield*, 30 Ill. App. 3d 1044, 333 N.E.2d 36; *People v. Harrington*, 22 Ill. App. 3d 938, 317 N.E.2d 161) and that a jury may properly reach a finding of sanity by accepting lay testimony over expert testimony (see, *e.g.*, *People v. Ford*, 39 Ill. 2d 318, 235 N.E.2d 576). Moreover, the weight to be given an expert's opinion is measured in part on "the factual details which he marshalls in support of it." *People v. Burress*, 1 Ill. App. 3d 17, 20, 272 N.E.2d 390, 392; *People v. Greenfield*, 30 Ill. App. 3d 1044, 1048, 333 N.E.2d 36, 39.

The only psychiatrist to ever put forth an opinion that defendant was suffering from a mental disease on the date of the robbery that would have caused him to lack substantial capacity to appreciate the criminality of his conduct was Dr. Goldsborough. He conducted only one two-hour interview with defendant. That interview took place 2½ years after the robbery and was primarily conducted for the purpose of determining defendant's competency to stand trial. From the doctor's testimony, it is apparent that his opinion concerning the defendant's insanity on the occurrence date was primarily grounded on his belief that schizophrenia does not develop overnight and that defendant's attempted suicide and his resultant short-term commitment to a mental institution in California in 1970 indicated that he had been suffering the psychosis of schizophrenia since at least that time.

We believe that the jury could properly have found that the psychiatrist's opinion should not be accorded much weight under the circumstances. First, we note that the first time defendant was diagnosed to be suffering from schizophrenia was in December of 1973, some 3 months after the robbery, as indicated in a staff report of that month from the Federal Medical Center. Dr. Goldsborough, however, viewed defendant's psychosis as being present since 1969 or 1970 and went so far as to hypothesize that had defendant been examined by a psychiatrist in 1969, such psychosis would have been discovered. The validity of these assumptions must be seriously questioned since the defendant was indeed examined by psychiatrists over a 17-day period in 1970 and found "not mentally ill" and as merely suffering from a moderate form of depressive neurosis. Moreover, even if defendant were schizophrenic on August 6, 1973, Dr. Goldsborough admitted that he had no way of knowing whether the condition was then in a state of partial remission so as to allow defendant to appreciate the criminality of his conduct.

Also bearing on the weight and accuracy of this expert opinion is the fact that defendant did not engage in any particularly bizarre or outrageous behavior between his attempted suicide in 1970 and his criminal actions in late 1973. In fact, defendant during this time period was able to take care of himself in various foreign countries, including

Spain and Germany, and was gainfully employed throughout the main portion of his European sojourn. In addition, if defendant's testimony be true, he successfully manipulated immigration authorities to deport him so he would not have to pay his passage home. These facts paint a picture of one who has managed to be self-sufficient under less than ideal circumstances. The jury might have found such a picture to be inconsistent with a belief that defendant was then a paranoid schizophrenic and legally insane.

The reports of the Federal psychiatrists do show that each of the involved staff members believed defendant to be suffering from paranoid schizophrenia from December 1973 until May 1975. They also predict a long-term affliction in the future. Their relevance to the question to be decided by the jury, however, was of a peripheral nature since they reflect no direct opinion as to defendant's legal sanity on August 6, 1973, or whether he was suffering from active paranoid schizophrenia on that date.

In view of the relative weakness of the expert testimony, the jury was warranted in closely scrutinizing the testimony of lay witnesses as to the defendant's actions and demeanor on the day in question and the details of the crime in determining whether defendant was then sane. Since that evidence adequately supports a finding of sanity, we shall not disturb the jury's verdict.

■■■ As already suggested, the State is not required to introduce explicit opinion testimony of the defendant's sanity in order to satisfy its burden of proof, but may satisfy its burden by other facts in evidence. (*People v. Arnold*, 17 Ill. App. 3d 1043, 309 N.E.2d 89; *People v. Burress*; *People v. Greenfield*.) It has been recognized that one of the facts which has particular relevance to a defendant's sanity is the existence of a plan or design for the crime, especially for escape and prevention of detection or concealment of the crime. (*People v. Elliott*, 32 Ill. App. 3d 654, 336 N.E.2d 146; *People v. Burress*; *People v. McClellan*, 46 Ill. App. 3d 584, 360 N.E.2d 1225.) In this case, the evidence showed a substantial plan. The defendant carried a valise in which to conceal his weapon and to place the proceeds of the robbery. He also had a getaway car posted close by the entrance to the bank. In addition, he chose a time to confront the teller when no guard was present in the bank's lobby. When ordered to halt his flight to his car, he immediately took cover and proceeded to shoot at the guard. We consider all of this as evidence that he both appreciated the criminality of his conduct and that he could conform his conduct to the law. Moreover, defendant was quite alert to the subtleties of the teller's acts during the robbery. He instantaneously apprehended the purpose of her glances toward another employee and as quickly discovered her ploy to give him stacks of singles instead of stacks of 100 and 50 dollar bills.

Added to this is the testimony of the doctor who treated defendant's leg wound and the arresting officer that defendant appeared normal to them. Their judgment is substantiated by defendant's ability to follow all instructions given to him on the day in question. Moreover, his silence was manifested only when in an official setting or when being asked questions about the crimes. He was responsive to the questioning of Dr. Hart and also acknowledged innocuous remarks or personal courtesies. In view of defendant's obvious intelligence and his awareness of his right to remain silent as evidenced by his repeated pointing at such right on a *Miranda* form while in the company of F.B.I. agent Bond, such silence may be as plausibly explained as a calculated tactic as of evidence of legal insanity.

Defendant's second contention is that he was denied a fair trial as a result of prejudicial remarks and incorrect statements made by the prosecutor during closing arguments. He draws our attention to 12 remarks of the prosecutor which he feels either misled the jury as to the insanity defense, improperly attacked certain defense evidence or put forth inferences not legitimately drawn from the evidence.

It is well settled that a reversal is not warranted unless it appears that the improper remarks complained of influenced the jury in a manner that resulted in substantial prejudice to the accused. *People v. Bell*, 27 Ill. App. 3d 171, 326 N.E.2d 507; *People v. McCorry*, 51 Ill. 2d 343, 282 N.E.2d 425.

We have examined the closing arguments of the prosecutor and have found that none of the portions objected to present reversible error either individually or cumulatively. No purpose would be served in reciting the challenged remarks.

■■ First, we note that five of the remarks were not objected to at trial. As a general rule, we would therefore consider any issue as to them to be waived. (*People v. Skorusa*, 55 Ill. 2d 577, 304 N.E.2d 630.) Even if they had been properly objected to, it would be our finding that they did not prejudice defendant. Two of the remarks, when read in context, are legitimate comments on inferences to be drawn from the evidence of defendant's behavior at the time of the robbery. Moreover, the prosecutor shortly thereafter emphasized that the jury was to go by the evidence and the instructions as to the law. We also find it extremely unlikely that the jury drew any improper inferences from the other unobjected-to remarks that could have inured to defendant's prejudice.

Second, we note that three of the remarks were objected to by defendant and that these objections were immediately sustained. The court specifically instructed the jury to disregard the remarks in two of these instances. None of the comments are so egregious as to justify a belief that the trial court's actions did not cure any error with respect to them.

Of the remaining remarks, only one in our judgment was improper.

The others were within the bounds of proper argument. Their purpose was to argue that the jury should place greater weight on the evidence as to defendant's actions on the day in question than on the opinion evidence and Federal reports in determining defendant's insanity. Under the circumstances of this case, we must conclude that no substantial prejudice to the accused resulted from the prosecutor's remarks and that these remarks were not a material factor in defendant's conviction. *People v. Fields*, 59 Ill. 2d 516, 322 N.E.2d 33.

The defendant's final contention is that he should have been given credit against his sentence for the period during which he was confined under Federal authority (August 6, 1973-December 12, 1975).

The time period for which defendant seeks credit contains two distinct components. During the time period, August 6, 1973, to February 22, 1974, defendant was simply in custody on the Federal bank robbery charges; however, during the remaining time, he was confined as a result of the District Court's finding that he was unfit to stand trial on the Federal charges.

■■ If these confinements had occurred in Illinois as a result of Illinois charges, defendant would be entitled to credit for both time periods. (See Ill. Rev. Stat. 1975, ch. 38, pars. 1005—8—7(b), 1005—2—2(c).) There are several reported cases in which a defendant has been held to be entitled to credit for time spent in custody in another jurisdiction, both in jail and in mental institutions due to unfitness; however, in all of those cases the confinements were imposed because of pending Illinois State charges. (*People ex rel. Bradley v. Davies*, 17 Ill. App. 3d 920, 309 N.E.2d 82; *People v. Williams*, 23 Ill. App. 3d 127, 318 N.E.2d 692.) We believe that these situations represent the furthest reach of section 5—8—7(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—7(b)) and find that a defendant is not entitled to sentence credit for time spent in custody in another jurisdiction as a result of Federal charges when no Illinois charges are pending or the cause for such confinement.

Section 5—8—7(b) provides:

> "(b) The offender shall be given credit on the maximum term and minimum period of imprisonment *for time spent in custody as a result of the offense for which sentence was imposed.*" (Emphasis added.) (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—7(b).)

The Council Commentary elaborates by saying:

> "This section * * * gives full credit for time served in custody as a result of the offense for which the sentence was imposed. This would apply irrespective of where the offender was confined and would apply to custody outside of the State." Ill. Ann. Stat., ch. 38,

par. 1005—8—7, Council Commentary, at.514 (Smith-Hurd 1973). As we read this commentary and statute itself, it contemplates credit being given for time served in custody, whether in Illinois or in other States as a result of the offense for which the sentence is imposed. It is apparent to us that the instant sentences were imposed on the Illinois charges of attempt murder and armed robbery embodied in the indictment of December 11, 1975, and not on the Federal bank robbery charge instituted in 1973. Although all of these charges arise from the same basic transaction, they are not synonymous. They are separate and distinct offenses. The instant sentences were not imposed on the Federal offense, and we therefore believe that it would thwart the plain meaning of section 5—8—7(b) to give defendant credit for the time of his confinement on the Federal charge.

For the reasons stated above, we affirm the judgment of the circuit court of Madison County.

Affirmed.

WINELAND, J., concurs.

Mr. JUSTICE GEORGE J. MORAN, dissenting:

The majority correctly holds that the State had the burden of proving the defendant was sane beyond a reasonable doubt. When this principle is applied in this case, I cannot see how the State sustained that burden.

At the close of the defense's case, an instruction conference was held in the judge's chambers during which the trial judge made the following comment on the evidence of defendant's insanity:

"I think not only does the evidence in this case show a reasonable doubt about his insanity * * *. Of course, I have not heard the State's rebuttal evidence at this point, but I think it borders on almost a directed verdict on the issue of insanity."

The State presented two witnesses in rebuttal of defendant's evidence of insanity. Dr. James Hart, who treated defendant for the gunshot wound in his leg, testified that Spears had no problem following directions and that there did not appear to be anything unusual about his behavior. Dr. Hart had no expertise in psychiatry or mental disorders and on cross-examination stated that he had no opinion as to the defendant's mental condition on the day of the robbery and shooting. Dr. Hart also stated on cross-examination that his observation of defendant's behavior on the day of the incident would not contradict the diagnosis of paranoid schizophrenia made by Dr. Goldsborough and the staff at the Federal Medical Center. The State's second rebuttal witness, F.B.I. agent Cecil

Bond, questioned defendant at the East Alton police station and accompanied him on the ride to the Federal magistrate's office in Alton. Agent Bond testified that the defendant was completely silent at the police station and refused to respond to any questions except to point to a statement on the interrogation form which stated that he had a right to remain silent. Bond also testified that during the automobile ride to the magistrate's office Spears expressed surprise when he was informed that he could post bond for armed robbery.

After the State completed its case in rebuttal, defendant moved for a directed verdict of not guilty by reason of insanity. In denying defendant's motion the trial judge made the following comment:

> "In view of the expert evidence that we have, there is a very serious question as to whether or not any conclusion can be reached other than that he is insane, at this time, or at the time he was in the Springfield mental hospital, however, there may be some question as to his exact condition at the time of the alleged incident and that is what the real issue is. * * * I think it is up to the jury to pass on the thing. If I were on the jury I would find the man was insane and not recovered, but I'm not on the jury and that is where there is a very fine line and a very difficult line for a trial judge to draw between what is material for a directed verdict and when he starts substituting his own opinion for what should be an opinion for the jury."

The evidence offered by the State in its case-in-chief and on rebuttal focused on defendant's behavior on the day of the offense. The State presented the testimony of five lay witnesses in an attempt to show that defendant acted in a normal manner during and after the bank robbery. The testimony of the bank teller robbed by defendant indicated that defendant was aware of what he was doing and was able to respond to a changing situation. The bank guard who wounded and subdued the defendant testified that he was able to follow instructions. The arresting officer testified that there appeared to be nothing unusual about the defendant other than the fact that he was completely silent and "just stared at me." A medical doctor with no training in psychiatry who treated defendant for the gunshot wound in his leg testified that he did not notice anything unusual about defendant. The F.B.I. agent who accompanied defendant on the automobile ride from the East Alton police station to the United States Magistrate's office testified that Spears would not respond to any questions except to point to a part of the interrogation form which advised that he had a right to remain silent. I do not believe that this testimony provided sufficient evidence from which the jury could find defendant sane beyond a reasonable doubt in view of

the expert medical testimony presented by defendant which the trial court viewed as raising a serious doubt as to defendant's sanity on the day of the offense.

The lay testimony presented by the State in this case was at best equivocal on the issue of insanity and wholly insufficient to satisfy the State's burden of proving defendant's sanity beyond a reasonable doubt. No opinions of defendant's mental capacity were offered by the State's witnesses in this case. The physician who treated the defendant's gunshot wound stated that he had no opinion as to defendant's mental condition and that his observation of defendant's behavior would not be inconsistent with the diagnosis of schizophrenia. Other witnesses testified that they did not notice anything unusual about defendant's behavior, but also stated that defendant was unusually silent and for the most part refused to respond to their questions and inquiries.

The State's obligation to prove defendant's sanity beyond a reasonable doubt is a heavy burden which cannot be satisfied by such equivocal and inconclusive evidence as is offered in this case.

After reviewing the record, I believe that a serious doubt remains as to defendant's sanity at the time of the offense. In *People v. Dawson*, 22 Ill. 2d 260, 174 N.E.2d 817, our supreme court said:

> "The finding of the trial judge as to the credibility of the witnesses is entitled to great weight. However, we cannot, in every case, accept the trial judge's finding as conclusive, for the rule is that it is the duty of this court to examine the evidence in a criminal case and if it is so unsatisfactory and unreasonable as to raise a serious doubt of defendant's guilt, the conviction must be reversed. (*People v. Williams*, 414 Ill. 414; *People v. Buchholz*, 363 Ill. 270.) The burden is always upon the State to prove the defendant guilty beyond a reasonable doubt and a judgment of conviction can be sustained only on credible evidence which removes all reasonable doubt of defendant's guilt. Where the State's evidence is improbable, unconvincing and contrary to human experience, we have not hesitated to reverse the judgments of conviction." 22 Ill. 2d 260, 264-65.

I would reverse defendant's conviction.