THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JACK KUHN, Defendant-Appellant.

Third District   No. 77-419

Opinion filed January 26, 1979.—Rehearing denied February 22, 1979.

Robert Agostinelli and Verlin R. F. Meinz, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward Keefe, State's Attorney, of Rock Island (James E. Hinterlong and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This case comes to us on appeal from the circuit court of Rock Island County. In a bench trial, wherein the only question was whether the defendant was legally sane at the time he committed the crimes, the circuit court concluded that defendant was, in fact, sane and therefore guilty of two counts of kidnapping and one count each of rape, aggravated battery, and robbery. Sentence was imposed of not less than 8 nor more than 24 years for rape, not less than 3 nor more than 9 years for the kidnapping and robbery charges, and not less than 1 nor more than 3 years for the aggravated battery. The sentences were to run concurrently.

The testimony adduced at trial tells a story of Christmas nightmare for several innocent parties. Walter Roth testified that on December 24, 1974, he was employed as a cab driver in Davenport, Iowa. At about 10 p.m. on that date he picked up a fare in Davenport and transported him first to Milan, then Moline, Illinois. Upon their arrival in Moline, the fare placed his hand in his pocket and while pointing something through his coat at Mr. Roth demanded Roth's money. Roth gave the man, whom he identified in court as the defendant, some $30 or $40. The defendant ordered the cab driver inside a house and, once there, threw him to the floor and started to beat and stomp upon him. This beating lasted, off and

on, for about an hour and was accompanied by the defendant's referring to Roth as his father and his wife's lover. The defendant, whom Roth thought had taken some drugs during the evening, would calm down for awhile but then fly off into a rage again.

Ms. Vendetta Strong, a close cousin of the defendant who lived in the house, confirmed Mr. Roth's story. She added that after tying Mr. Roth up and making him lie face down on the floor, the defendant had intercourse with her against her will. According to Ms. Strong the defendant then calmed down and sat still for awhile, but eventually led Mr. Roth into a bathroom and Ms. Strong to a sofa where he again had intercourse with her after threatening others in the house.

Sometime later the five persons in the house, the defendant, Mr. Roth, Ms. Strong, Ms. Strong's mentally handicapped brother and her palsied son, entered Ms. Strong's car at the defendant's direction. The five then drove to Interstate 74 and headed east, stopping twice at the defendant's suggestion, once near Peoria and once in Indiana. Just prior to leaving, however, the defendant moved the cab behind the house so it could not be found.

While travelling on the interstate, the defendant was the one giving the directions. He mentioned going to Virginia to kill his ex-wife's husband and his ex-wife. The quintet finally stopped in Ohio where they drove around looking for an apparent friend of the defendant. They finally found him and the defendant left the car to speak with the man. As he did so Ms. Strong handed Mr. Roth an extra key. The four kidnap victims drove off, stopping only briefly in Ohio before returning to Moline where they reported the matter to law enforcement officers in Rock Island County.

Mr. Roth had never seen the defendant before the time of this incident. He thought the defendant was well oriented as to time and place, although he described the defendant's conduct as "irrational." Ms. Strong was the defendant's cousin, had known him all his life, and considered herself a close relative of his. She testified that he did not normally act as he did during this incident.

Two psychiatrists examined the defendant in connection with proceedings in the State of Ohio which concerned an offense committed in that State on December 26, 1974. One, Dr. Francisco Vidal, examined the defendant in March 1975, and concluded that he was suffering from a mental illness called schizophrenia-reaction, paranoid type. This caused Mr. Kuhn to be unable to distinguish right from wrong. Dr. Vidal was generally unwilling to speculate concerning the defendant's condition three months before the examination. A second psychiatrist, Dr. Sheldon Rogers, examined Kuhn in July of 1976, considering both a personal interview and the defendant's records from the mental hospital in Ohio.

Dr. Rogers concluded that the defendant hallucinated frequently, was mentally defective, and suffered from schizophrenia. In response to a hypothetical question, Dr. Rogers explained that the defendant was unable to distinguish right from wrong in December of 1974.

These psychiatrists were unable to testify at the defendant's trial in his case in Rock Island County. A transcript of their testimony from the Ohio proceedings was, nonetheless, available. This transcript was referred to by an examining psychiatrist in Illinois and was admitted as Defendant's Exhibit 1 at trial.

Dr. Thomas Tourlentes, a psychiatrist in the State of Illinois, did testify at the defendant's trial in this case. He examined the defendant and found him to be well oriented as to time and place and diagnosed him as having an antisocial personality and problems with alcohol and drugs. In response to a question as to whether the defendant had the capacity to appreciate the criminality of his conduct or to conform his conduct on the 24th of December, 1974, Dr. Tourlentes answered that the defendant did have sufficient awareness of what he was doing and what the consequences of what he was doing might be. The doctor continued by testifying that the defendant's antisocial personality when combined with alcohol and drugs could result in impairment of mental functions which resembled psychotic symptoms.

Based upon the testimony of these lay and expert witnesses, the trial court concluded that the defendant was legally sane. It ruled, consequently, that the defendant was guilty of each offense charged.

The defendant alleges on appeal that the circuit court erred in finding that the State's evidence was sufficient to overcome the showing of defendant's insanity. Section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 6—2) provides the following definition of the affirmative defense of insanity:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

This language, then, provides the basis for the legal issues which are raised on this appeal. An excellent discussion of this language occurs in a recent case decided by the Fifth District Appellate Court. Because it provides such a lucid analysis, we will quote at length:

"A defendant is thus relieved of criminal liability if at the time of the offense a 'mental disease or defect' prevented him from

appreciating the wrongfulness of his conduct or from conforming his actions to the requirements of law. This formulation of the insanity defense is based on the test established by the American Law Institute in the Model Penal Code (A.L.I. Model Penal Code §4.01 (1962)), and differs from early formulations of the insanity defense in several important respects. The present test is based on a determination of substantial incapacity to appreciate the wrongfulness of particular conduct in contrast to an earlier Illinois rule which required a finding of total incapacity to know that certain conduct was wrong. [Citation.] In addition, substitution of the word 'know' with the term 'appreciate' reflects an attempt to adapt the formulation of the insanity defense to new developments in modern psychiatry and to provide some flexibility in the permissible scope of expert testimony. [Citations.] Finally, section 6—2 adopts the position of earlier tests that either an impairment of cognition or an impairment of volitional capacity may prevent an individual from conforming his actions to the requirements of the law and therefore give rise to a defense of insanity. The principal question raised by an assertion of the insanity defense, then, is 'whether defendant's incapacity proceeds so far as to render him incapable of "conform[ing], his conduct, to the requirements of the law." ' [Citation.] Thus, although an accused understood the nature of his conduct and appreciated its wrongfulness, he will be excused from criminal liability if his ability to consciously refrain from the conduct was substantially impaired by a mental defect. [Citation.]

The defense of insanity must be raised by an accused at trial by a presentation of evidence sufficient to overcome a presumption of sanity during the commission of a crime which automatically attaches to a criminal defendant. [Citation.] The defendant's burden of raising the issue of insanity at trial and the State's burden of proving defendant's sanity have been the subject of several Illinois Supreme Court opinions. * * * [I]t is now clear that once a defendant presents sufficient evidence to raise a reasonable doubt as to his sanity at the time of the offense the State must prove defendant's sanity beyond a reasonable doubt, as a necessary element of the case." *People v. Spears* (1978), 63 Ill. App. 3d 510, 516-17, 380 N.E.2d 423, 449-50.

The posture of this case is such that the defendant has presented sufficient evidence to raise a reasonable doubt as to his sanity and the State must carry the burden of proving sanity as an element of its case.

A trial court's finding of sanity will not be disturbed unless it is so palpably erroneous as to indicate that it was based on prejudice or

passion. (*People v. Rennert* (1977), 49 Ill. App. 3d 485, 364 N.E.2d 506; *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.) We cannot say that based upon all of the evidence in this case the decision of the trial court was palpably erroneous.

■■ Dr. Tourlentes testified that he diagnosed the defendant as a sociopathic personality. It is clear from the statute that this type of abnormality is not a mental disease or a mental defect sufficient to relieve one of criminal responsibility. (See Ill. Rev. Stat. 1977, ch. 38, par. 6—2(b).) Thus, any behavior which might result from the defendant's abnormality, if Dr. Tourlentes' testimony is accepted, would not be excused by the statute.

■■ Dr. Tourlentes continued his testimony by explaining that the sociopathic abnormality in combination with the use of drugs or alcohol could result in impaired mental functions resembling psychotic symptoms. While it is true that an abnormality diagnosed as psychosis would qualify as a mental disease or defect, such was not defendant's diagnosis. Rather, the symptoms exhibited by the defendant after voluntary intoxication only resembled psychotic symptoms. Further, it is well established in Illinois that voluntary intoxication is no defense to criminal conduct. Ill. Rev. Stat. 1977, ch. 38, par. 6—3.

■ We acknowledge that there was conflicting expert psychiatric testimony before the court. The trier of fact is not, however, required to accept the conclusions of an expert witness. Rather, the trier of fact may properly reach a finding of sanity by accepting lay testimony over expert testimony. (*People v. Spears*; *People v. Varnado* (1978), 66 Ill. App. 3d 413.) Moreover, weight to be given an expert's opinion is measured in part on factual details which he marshals in support of it. (*People v. Spears*; *People v. Varnado*.) There are ample factual details to support a finding that the defendant's conduct exhibited a purpose and an awareness of wrongfulness. The defendant persistently took steps to avoid discovery and capture. When he first kidnapped the cab driver, the defendant ordered him to rip out the wires on the cab's radio; then, before leaving Moline in Ms. Strong's car, the defendant concealed the cab behind the house so it would not be found and told his cousin that they would have to leave before daylight so that the police would not discover the cab. He also warned his captives to do nothing which would attract attention to them and threatened to kill them because he had nothing to lose. Each time the quintet stopped defendant turned off the car's engine and took the keys with him. During the entire trip defendant navigated without a road map, terminating the journey at a farm on the outskirts of a small Ohio town. The defendant's ability to plan his action to avoid detection while forcing his victims to accompany him to a different location thus

casts considerable doubt upon his claim of insanity and demonstrated that his actions were both calculated and knowing.

Mr. Roth testified that he thought the defendant was well oriented as to time and place. Ms. Strong testified that the defendant did some wild things when he was drunk. Evidence of idiosyncratic behaviour, irresponsible conduct, unreasonable judgments or the commission of atrocious crimes does not alone constitute reasonable doubt of sanity. *People v. Varnado.*

In summary, the circuit court had before it the following evidence: two expert diagnoses that the defendant was schizophrenic, a mental disease or defect under the law, and one expert diagnosis that the defendant had a sociopathic personality, an abnormality which is not a mental disease or defect according to the statutory definition. Also, two experts did not believe the defendant could distinguish right from wrong. It is noteworthy that Dr. Vidal was unsure whether defendant suffered from this symptom in December 1974. The witness Dr. Tourlentes believed that the defendant was aware of what he was doing and what the consequences of what he was doing might be. Finally, the overwhelming body of lay testimony supported the position that defendant's conduct exhibited a purpose and an awareness of wrongfulness. After a careful consideration of this evidence, and for the reasons above stated, we cannot say that the decision of the circuit court was palpably erroneous. The lower court's opinion is in accord with the testimony of an unimpeached expert witness whose opinion is supported by the vast preponderance of lay testimony offered in evidence, and the judgment of the circuit court is therefore affirmed.

Affirmed.

BARRY, P. J., and ALLOY, J., concur.