THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RONALD W. UPPOLE, Defendant-Appellant.

Third District    No. 80-612

Opinion filed June 4, 1981.

James D. Reynolds & Associates, of Peoria, for appellant.

Bruce W. Black, State's Attorney, of Pekin (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE SCOTT delivered the opinion of the court:

Following a discharge hearing pursuant to section 104—25 of the Code of Criminal Procedure (Ill. Rev. Stat., 1979 Supp., ch. 38, par. 104—25), the Circuit Court of Tazewell County found the defendant, Ronald W. Uppole, guilty beyond a reasonable doubt of murder. The court further found that the defendant remained incompetent to stand trial after two years of psychiatric treatment and three previous fitness hearings and remanded him to the Illinois Department of Mental Health for an extended treatment period of five years (Ill. Rev. Stat., 1979 Supp., ch. 38, par. 104—25(c)(2)). The only issue presented for review is whether the State proved beyond a reasonable doubt the defendant's sanity at the time the offense occurred. Because the evidence on the issue of the

defendant's sanity is a close question in the case at bar, we report that evidence in detail.

The State's first witness in its case in chief was Officer Patrick Quinn. At approximately 10:40 a.m. on August 2, 1978, Quinn responded to a call that gunshots were being fired at 123 Spring Street, East Peoria, Illinois. As he arrived, two more shots were fired inside the house. Using a public address system, Quinn ordered the occupants of the house to exit. The defendant and his daughter came out. Quinn then ordered the defendant to kneel and he complied. The officer asked the defendant whether anyone else remained in the house, to which he replied "she's upstairs." Quinn also asked the defendant where the gun was located, and he answered, "in the living room." The officer then entered the house and found a .38-caliber Smith & Wesson pistol on the living room table and the victim, the defendant's estranged wife, Nelma Uppole, dead in a second floor bedroom.

Officer John Boesh testified that the defendant's clothes were spattered with blood. During booking, the officers inventoried the defendant's personal property and found two receipts from Jack Hunter's Gun Supply, one for a Colt pistol and the other for a .38-caliber Smith & Wesson pistol. The latter receipt matched the pistol recovered at the scene and which was ultimately determined to be the murder weapon. The sales were made a few days before the shooting.

Robert DuBois, a crime scene technician, testified as an expert in reconstructing the instant offense from the evidence gathered. Using the six-shot .38-caliber Smith & Wesson pistol, the assailant shot the victim, who stood in front of the upstairs bed, once in the chest. She clutched her wound and was shot again in the right hand. She then fell back on the bed, whereupon she was shot in the head at point blank range four more times. The assailant then apparently walked downstairs and emptied four of the six bullet casings from the revolver. He returned to the bedroom, placed four more cartridges into the gun from a box located behind a chest of drawers, and while leaning over the victim, fired three more shots into her chest and another bullet into her head. Then all six cartridge casings were removed from the revolver and five more rounds were loaded into the weapon. The weapon was in this condition when recovered by police from the living room table. DuBois further testified that the fingerprints on the revolver matched those of the defendant.

The defendant's father, Marvin Uppole, testified on behalf of the defendant to establish his defense of insanity. Marvin related a conversation with the defendant which took place in early June 1978. The defendant informed his father that his wife, Nelma, was seeing other men and had told the defendant of her sexual encounters with her paramours. The defendant told his father that this situation was "hard to take," but he

still confessed love for her. He also assured his father that he "couldn't hurt her." After that, Marvin received reports that the defendant "started acting kind of funny and didn't act like himself." Then on June 23, 1978, the defendant attempted suicide by taking an overdose of pills and inhaling gas. After being released from the hospital, the defendant left his wife and lived with his brother until August 2, 1978, the date of the offense. He did, however, see his wife on several occasions. The defendant informed his father that he received several calls from his wife asking him to return home and have sex. He also admitted he had threatened her with a gun because, "she won't even talk to me when I'm trying to talk to her and that's the only way I can get her to talk to me." During these conversations, Marvin described his son's demeanor as "funny." He related no specific details.

Kim Kelly, a law clerk for defense counsel, testified that he first saw the defendant on August 2, 1978, as the police held the defendant in custody. Kelly attempted to ask the defendant about the shooting, but he failed to respond and remained absolutely motionless throughout the encounter with Kelly. The law clerk, who had an educational background in psychology, described the defendant's demeanor as catatonic-like.

The final defense witness, Dr. James Ward, a psychiatrist, first treated the defendant following the June 23 suicide attempt. He saw the defendant twice more before the August 2 shooting. According to the doctor's observations, the defendant was "emotionally invested" in his marriage. Because the marriage was "the central theme of his life," the defendant's feelings toward his wife were proprietary. Consequently, the defendant developed an enormous fear of losing her. This fear also manifested itself in anger against her. To allay these fears, the defendant invoked two ego-defense mechanisms, repression and denial. Thus, he internalized his feelings and his actions became over-controlled. In the opinion of Dr. Ward, the defendant's wife acted as a stimulus that created the intense anger and emotions within him.

Believing the defendant to be nonpsychotic, the psychiatrist released the defendant from the hospital shortly after the attempted suicide and prescribed a combined antispasmodic and tranquilizer for the defendant. On July 27 the defendant informed Dr. Ward that he had purchased a gun and had threatened to kill his wife and himself. At the same time, however, the defendant believed his wife was "mellowing," and he expressed optimism to Dr. Ward that he would soon be reunited with his wife.

The doctor next saw the defendant after the shooting on August 2. At first the defendant appeared extremely mute and withdrawn, and Dr. Ward was unable to gather any information from him. Later that night, however, the defendant gave a "pretty good" account of the shooting. In fact, at that encounter the defendant was in his most lucid state of mind.

According to the doctor's notes, the defendant was logical, coherent, and oriented to time, place, and person. He said he waited for his wife to return home from a date with another man on August 1. She failed to return that night, but came home during the morning of August 2. He approached her and put his arms around her. She told him that he would have to become accustomed to seeing her with other men. The defendant then became uncontrollably enraged, shot his wife several times and attempted to shoot himself but failed.

Following this lucid moment, Dr. Ward observed the defendant's condition steadily deteriorate. His behavior became extremely infantile. He denied shooting his wife and informed Dr. Ward that he spoke with and saw his wife months after her death. He has received psychiatric treatment in a mental health facility since August 2, 1978.

From these examinations, Dr. Ward formulated an opinion as to the defendant's mental condition at the time of the shooting. Dr. Ward believed that the defendant was driven by impulses, caused by his fear of losing his wife, over which he had no control. When asked on direct examination whether the defendant suffered from a mental disease or defect at the time of the shooting, Dr. Ward said the defendant was not suffering from a psychotic process (an inability to appreciate reality). Instead, he characterized the problem as depressive neurosis (incapable of dealing with personal conflicts). Dr. Ward described the neurosis as affecting the defendant's affective (emotional) processes, but leaving his cognitive processes substantially unaffected. Thus, because his senses were not disabled, he could appreciate the criminality of his conduct, as well as respond to his environment. However, when stimulated by his wife, he then became enveloped in repressed emotions and feelings which he was unable to contain. Dr. Ward believed that if a nonpsychotic disorder could be characterized as a mental defect, then the defendant suffered from a mental defect.

On cross-examination, Dr. Ward again declared that in his opinion the defendant suffered from a nonpsychotic emotional disorder, not a cognitive one. The doctor stopped short, however, of saying that the defendant's neurosis was a mental defect. When asked whether depressive neurosis was a fairly common ailment, Dr. Ward replied in the affirmative. When confronted with his unsureness as to whether the defendant's uncontrollable conduct was a product of a mental defect, the doctor again equivocated by not directly answering the question. On redirect examination, he answered that the neurosis was a "classifiable mental defect."

The defense then rested and the State waived rebuttal. The court, sitting without jury as directed in section 104—25(a), found that the State proved the defendant guilty beyond a reasonable doubt of murder.

Moreover, the court ruled that the defendant had made no progress under psychiatric treatment toward attaining fitness and committed him to the Department of Mental Health for an extended period of five years.

■■■ Section 6—2 of the Criminal Code defines the affirmative defense of insanity (Ill. Rev. Stat. 1979, ch. 38, par. 6—2), as follows:

> "(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
>
> (b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." (Ill. Rev. Stat. 1979, ch. 38, par. 6—2.)

This section adopts the ALI modification of the traditional insanity defense, or the M'Naghten test. (See Ill. Ann. Stat., ch. 38, par. 6—2, Committee Comments, at 326-30 (Smith-Hurd 1972).) The principal question raised by the assertion of the insanity defense is "whether defendant's incapacity proceeds so far as to render him incapable of 'conform(ing) his conduct, [*sic*] to the requirements of the law.'" (*People v. Spears* (1978), 63 Ill. App. 3d 510, 516, 380 N.E.2d 423, 428.) Thus, even though an accused understood the nature of his conduct and appreciated its wrongfulness, he will be excused from criminal liability if his ability to consciously refrain from the conduct was substantially impaired by a mental defect. See *People v. Bender* (1960), 20 Ill. 2d 45, 169 N.E.2d 328.

■■ Unless the State anticipates the insanity defense and raises the issue in its case in chief, the defendant has the burden of producing "some evidence" of insanity sufficient to overcome a presumption of sanity during the commission of a crime which automatically attaches to a criminal defendant. (Ill. Rev. Stat. 1979, ch. 38, par. 3—2(a); *People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321, *cert. denied* (1970), 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094.) If the defendant meets this burden of production, the State must then sustain the burden of proving the defendant guilty beyond a reasonable doubt as to his sanity at the time of the offense together with all other elements of the offense. (Ill. Rev. Stat. 1979, ch. 38, par. 3—2(b).) As such, the question of the defendant's sanity is one of fact. (*People v. Ford* (1968), 39 Ill. 2d 318, 235 N.E.2d 576.) Thus, the determination by the trier of fact on the insanity issue is accorded the same standard of appellate review as is applied to jury verdicts generally. A circuit court's finding of insanity will not be disturbed unless it is so palpably erroneous as to indicate that it was based on prejudice or passion.

■■ To meet its burden of persuasion, the State must establish the defendant's sanity by using circumstantial as well as direct evidence. (See,

*e.g., People v. Kuhn* (1979), 68 Ill. App. 3d 59, 385 N.E.2d 388.) For example, the circumstances surrounding the commission of the crime which suggest a carefully contemplated scheme may be used to infer sanity. Evidence of sanity may be proved by either lay or expert testimony. Moreover, a jury need not accept the conclusions of a psychiatrist and may base its conclusion by accepting lay testimony over expert testimony. *People v. Ford* (1968), 39 Ill. 2d 318, 235 N.E.2d 576.

■■ In the case at bar, the defendant first argues that because the State failed to offer any direct rebuttal evidence on the issue of the defendant's sanity, the State failed to sustain its burden of persuasion. We disagree. The State is not required to offer explicit opinion testimony of the defendant's sanity to carry its burden of proof. (*People v. Young* (1978), 60 Ill. App. 3d 351, 376 N.E.2d 739.) The State may rely solely upon the evidence adduced in its case in chief to establish the defendant's sanity. *People v. Jackson* (1976), 42 Ill. App. 3d 919, 356 N.E.2d 979.

■■ The defendant next contends that the testimony of Dr. Ward, the defendant's father, and defense counsel's assistant, raised a reasonable doubt concerning the defendant's sanity. In response, the State argues that because the only direct testimony indicating that the defendant suffered from a mental disease or defect was Dr. Ward's extremely equivocal testimony, no reasonable doubt of the defendant's sanity exists. We agree with the State's argument and affirm accordingly.

The case at bar epitomizes the uncertainty surrounding the definition of mental disease or defect for the purpose of determining legal insanity. While section 6—2 contains no definition of the concept, section 6—2(b) specifically excludes psychopathic behavior because the psychopath differs from a normal person quantitatively, or as a matter of degree, and not qualitatively.

Likewise, courts are reluctant to define the concept of mental disease or defect in purely medical terms because of the fear that the opinion of the expert would reduce or eliminate the role of the jury in determining the issue of sanity. This reluctance may also come from the apprehension that strictly medical nomenclature may in fact be anchored upon shifting sands. (See *Blocker v. United States* (D.C. Cir. 1959), 274 F.2d 572, *rev'd on other grounds* (D.C. Cir. 1961), 288 F.2d 853.) Consequently, courts have held that classifications of mental disease or defect developed by psychiatrists for the purpose of treatment need not control the legal definition used for assessing criminal responsibility. See *Washington v. United States* (D.C. Cir. 1967), 390 F.2d 444.

■■ This incongruity between the legal and medical definition of mental disease or defect exists in Illinois law as well. For example, in *People v. Kuhn* (1979), 68 Ill. App. 3d 59, 385 N.E.2d 388, we stated that an abnormality competently diagnosed as psychosis would qualify as a mental

disease or defect. In *People v. Drummond* (1980), 87 Ill. App. 3d 890, 409 N.E.2d 361, on the other hand, the court ruled in a case almost identical to the case at bar that an expert's equivocal testimony concerning the defendant's neurotic behavior qualified neither qualitatively nor quantitatively as evidence of a mental disease or defect. Moreover, our law is well established that evidence of "personality disorders" does not constitute a mental disease or defect as contemplated in section 6—2. *People v. Williams* (1967), 38 Ill. 2d 115, 230 N.E.2d 224.

■■ In the case at bar, the only evidence tending to raise a reasonable doubt of the defendant's sanity at the time of the offense was the testimony of Dr. Ward. Although the defendant's father stated the defendant acted "funny" prior to the shooting and Kelly recounted the defendant's "catatonic-like" state following the shooting, such lay evidence of idiosyncratic or distorted behavior, irresponsible or bizarre conduct, unrealistic judgments, or the commission of atrocious crimes does not alone justify a reasonable doubt of sanity. *People v. Varnado* (1978), 66 Ill. App. 3d 413, 384 N.E.2d 37.

Dr. Ward testified that the defendant's behavior at the time of the offense was definitely nonpsychotic. As such, the defendant knew he was killing his wife, and he appreciated the criminality of his acts. The psychiatrist asserted, however, that because of the defendant's depressive neurosis, he was incapable of controlling his behavior when he confronted his wife on August 2, 1978. Dr. Ward based this diagnosis on the three examinations conducted between the defendant's attempted suicide and the shooting. When asked whether such a condition constituted a mental disease or defect, he equivocated. Initially, the psychiatrist agreed that the condition was a mental disease or defect, but only by way of affirmatively responding to defense counsel's leading questions. He again equivocated when asked by the State to explain his position. During cross-examination, Dr. Ward stated that the defendant's neurosis was caused by his discontentment with his domestic environment and his refusal to accept it. The psychiatrist also admitted that the neurosis was a fairly common ailment. Finally, on redirect examination, when asked again whether the defendant's condition constituted a mental disease or defect, he stated only that the condition was a "classifiable" mental disease.

We find such evidence does not raise a reasonable doubt as to the defendant's sanity. (See *People v. Drummond* (1980), 87 Ill. App. 3d 890, 409 N.E.2d 361.) The defendant's expert witness was unable to state without qualification that the defendant suffered from a mental disease or defect, for the purpose of assessing criminal responsibility. We also note that, based solely on Dr. Ward's testimony regarding the causes of the defendant's condition, the depressive neurosis seems more closely associated with a personality disorder than with a mental disease or defect

contemplated in section 6—2. Personality disorders ordinarily do not justify reasonable doubt of sanity. (*People v. Lono* (1973), 11 Ill. App. 3d 443, 297 N.E.2d 349.) Moreover, there existed little evidence to find that the defendant's alleged mental disease or defect, as manifested in the case at bar, substantially affected his behavioral controls. The defendant's affective system, which the neurosis allegedly affected, remained under control during the several times prior to the shooting that he talked with his estranged wife, including a meeting where he carried a gun in order to "get her to listen to him."

A similar situation was presented in *People v. Arnold* (1974), 17 Ill. App. 3d 1043, 309 N.E.2d 89. There, the defendant appealed from his conviction of murder, claiming he was not proved sane beyond a reasonable doubt. The defendant offered expert testimony to support his contention that upon learning that his wife was having sexual relations with another man, the defendant killed his wife while in a state of insanity. With some equivocation, the defendant's psychiatrist stated the defendant suffered from the mental disease of acute transitional reaction. According to the psychiatrist, a person afflicted with the disorder would remain outwardly calm until confronted with a personal conflict, such as learning one's spouse was having an affair. Then, the person would become "unglued" and act without control. The only evidence to support a finding of sanity consisted of lay opinions based on observations made before and soon after the killing that the defendant appeared calm and normal. In upholding the conviction, this court found that the trier of fact did not act unreasonably in rejecting the psychiatrist's testimony in light of the lay testimony describing the defendant shortly after the killing as calm and apparently normal. Accord, *People v. Drummond* (1980), 87 Ill. App. 3d 890, 409 N.E.2d 361 (equivocal expert testimony insufficient); *People v. Kuhn* (1979), 68 Ill. App. 3d 59, 385 N.E.2d 388 (expert testimony insufficient in light of contrary circumstantial evidence).

Likewise, in the instant case, the circuit judge did not act unreasonably by accepting the State's evidence consisting of the officers' observations that the defendant calmly obeyed their instructions and by rejecting Dr. Ward's equivocal expert testimony describing the symptoms of the alleged mental disease or defect.

For the foregoing reasons, we affirm the finding entered in the Circuit Court of Tazewell County and the order remanding the defendant to the Department of Mental Health for five years.

Affirmed.

BARRY and HEIPLE, JJ., concur.