THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ANTHONY ROMAINE, Defendant-Appellant.

Third District    No. 78-376

Opinion filed December 31, 1979.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE ALLOY delivered the opinion of this court:

Defendant Anthony Romaine appeals from a conviction of armed robbery and, also on three counts of armed violence. Defendant was sentenced to concurrent terms of imprisonment of not less than six nor more than 15 years for armed robbery and to not less than one nor more than three years for each of the armed violence convictions. The sentences for robbery and armed violence were made concurrent terms of imprisonment but directed to be served consecutively to a sentence which defendant Anthony Romaine was already serving.

At the trial, the State's evidence established that on October 19, 1977, at approximately 3:45 p.m., the defendant entered the office of Robert Johnson, then the supervisor of the Joliet Community Correctional

Center. While in Johnson's office, the defendant made a number of threatening statements while holding a baseball bat. Johnson testified that, although he detected the odor of alcohol on the defendant's breath, the defendant did not appear to be intoxicated. After several threats and threatening acts by the defendant, Johnson, believing he was going to be struck, grabbed the bat with one hand and pushed the defendant with his other hand. However, before he could open the office door, the defendant, wielding the bat, struck Johnson across the left shoulder. Nevertheless, Johnson made his escape.

Johnson's secretary, Karen Smith, testified that she had seen an unidentified resident of the correctional center enter Johnson's office and close the door. The next thing she remembered was hearing Johnson saying "No, no, don't do that." Then Johnson yelled out her name and ran out of the office, being chased by the defendant carrying a baseball bat. After they left, Smith closed the office door, mistakenly unlocking it in the process, and called the police. After reporting the incident, she received a call from Johnson. During this conversation, the defendant entered the office, accompanied by Gregory Allen, and ordered her to hang up the telephone. The defendant, still carrying the bat, demanded Smith's money and car keys. She complied. He also ordered her to accompany him, but as he was leading her outside, a counselor distracted the defendant, enabling Smith to escape.

Darrell McDaniel, a counselor at the correctional center, testified that upon hearing a loud scream and seeing someone run past his office, he entered the hallway where he observed the defendant with a baseball bat. He asked the defendant what was wrong, to which question the defendant replied, "Get out of my way," and struck McDaniel on the face and shoulder with the bat. After being struck, McDaniel exited the building and while outside observed the defendant come outside, look around momentarily as though he were looking for someone else, and then re-enter the building.

A short time later, the defendant again exited the building, this time accompanied by Smith. At this point, McDaniel attempted to persuade the defendant to leave Smith alone by saying, "You're getting yourself into more trouble, why don't you just leave her alone." To this defendant replied, "You're going to try to play hero," and walked toward McDaniel. Smith took this opportunity to run back inside the building, and McDaniel, in turn, backed away. The defendant headed for the parking lot.

Another State's witness, Gregory Allen, employed as a cook at the work release center on the date of the incident, testified that at approximately 4 p.m. the defendant came into the kitchen carrying a baseball bat and asked if Allen had a car. After Allen answered

affirmatively, the defendant requested the keys. When informed that the keys were in Allen's coat in Johnson's office, the defendant stated, "Let's go get them." Starting down the stairs, the defendant struck Allen on the right arm and told him to move faster before the defendant "tore Allen's head off." Upon reaching Johnson's office, the defendant, addressing Smith, stated, "Didn't I tell you to stay off the telephone" and asked if Allen's coat was in the office. After Smith indicated that the coat was not in the office, the defendant demanded Smith's keys and money and left the building with her.

In the parking lot, the defendant was confronted by Robert Townsel, a parole officer. Townsel displayed his badge and ordered the defendant back into the work release center. The defendant asked if Townsel had anything other than the badge and, when the officer indicated he did not, stated, "Well, you can't stop me with a badge." The defendant then entered a Means Towel Service van which pulled into the parking lot. The driver of the van jumped out when the defendant gestured with his bat. Townsel, however, used his own vehicle to block the van's exit, and an Illinois State Trooper arrived a short time later.

Trooper Thatis Kemp testified that, when he arrived at the Joliet Correctional Center, he approached a crowd of people in the parking lot who were pointing at a blue delivery van and were indicating that the defendant was in the van and still had a baseball bat. Approaching the van, Kemp drew his pistol and ordered whoever was in the van to come out in such a manner as to allow the Trooper to see the person's hands. At this point, the defendant left the van. A subsequent search of the van turned up the baseball bat.

Later, as the defendant was sitting in the back of the squad car, he made statements to the effect that he should have killed Johnson as he intended, that he had a butcher knife, and that next time he saw Johnson he would kill him and that he would blow Johnson's head off. Defendant also said that his reasons for his actions were that he could not stand the pressures, that he wanted to go back inside. On cross-examination, Kemp acknowledged that he noticed a strong odor of alcohol around the defendant's person and indicated that he found no knife on defendant or in the van, but he further testified that during the time the defendant was in the squad car, the defendant was talking incessantly and that many of the things he said made no sense. Kemp also acknowledged that during the approximately 45 minutes that Kemp had an opportunity to observe defendant, defendant did not appear rational.

Johnson also indicated that he did not know what caused the defendant to act as he did and that he did not understand the defendant's behavior. Similarly, McDaniel testified that there appeared to be no

reason for the defendant's actions which did not appear to McDaniel to be rational, which he explained to mean not normal.

In his defense, the defendant called Dr. Albert Henry Stipes and Gwendolyn Holloway, the defendant's sister, in an attempt to raise the affirmative defense of insanity. Dr. Stipes, a psychiatrist, testified that he had performed a psychiatric examination of the defendant and that, as a result of both that examination and other information, he was able to reach a diagnostic impression regarding the defendant. That diagnosis was in two parts: the first part being that defendant has an explosive personality, and the second part of the diagnosis was that it would require further study to rule out the possibility that the defendant was suffering from episodic discontrol syndrome.

Conceding there was no solid evidence to support his second diagnosis, this diagnosis was based on a 45-minute interview, from which Dr. Stipes obtained a history of the defendant and his present problem. Dr. Stipes also based his diagnosis on records of an examination of the defendant in 1969 by the Psychiatric Institute of the Cook County Circuit Court. Dr. Stipes indicated that he felt that an electroencephalogram (EEG) taken as part of that 1969 examination was partially relevant to his diagnosis, since it showed slowed brain activity (low brain electrical voltage) which usually indicates some type of brain damage. Also relevant to Dr. Stipes diagnosis was a report by Dr. Soporin, the doctor who examined the defendant in 1969, which indicated that defendant had evidence of brain damage in a convulsive disorder, *i.e.*, epilepsy.

From the defendant's personal history, Dr. Stipes found particularly important defendant's history of sudden outbursts of violence for no apparent reason, which were usually preceded by severe headaches for a period of several hours prior to the episode. After an episode, defendant would sleep for a long period of time. Sometimes the episodes were preceded by defendant taking a small amount of alcohol.

Through the use of this material, Dr. Stipes reached the conclusion that the possibility existed that the defendant was suffering from episodic discontrol syndrome, which is also known as limbic epilepsy. Limbic epilepsy is distinguishable from the more common types of convulsive epilepsy (involving unconsciousness, falling down, and shaking) which originate in the cortex of the brain or on the surface of the brain and which can be easily picked up by an EEG. Limbic epilepsy originates very deep within the brain in an area called the limbic node of the brain and, as a result, is very difficult to pick up with an EEG.

The normal procedure used in diagnosing limbic epilepsy is to rely on the patient's history, both from what the patient says and from what other people who have observed him have to say about the spells he has.

In evaluating the defendant, Dr. Stipes indicated that defendant's spells of violent behavior and the reports from the psychiatric institute lead him to believe that a diagnosis of limbic epilepsy might be warranted. Dr. Stipes also indicated a reliance on a report of an incident involving the defendant made by the defendant's sister, Gwendolyn Holloway, in which she indicated that the defendant had been sitting at a table with her and other relatives when he suddenly had a very bad headache, held his head, ran out and got into a fight with someone in the hall. Ms. Holloway had also related to Dr. Stipes how, on the day of the incidents involved in the case at bar, she had received a phone call from the defendant during which he told her that he had an attack of these headaches again and felt that he was going to have a spell. Finally, Dr. Stipes also indicated that he considered the defendant's history of the attacks being set off by taking small amounts of alcohol was a classical symptom in this case. Such a symptom is called pathological intoxication.

Additionally, Dr. Stipes testified that the normal procedure in diagnosing limbic epilepsy also involved doing an EEG. Such an EEG was performed in the case at bar at St. Joseph's Hospital in Joliet. In the instant case, the EEG was negative. A negative EEG is not, however, rare where limbic epilepsy is involved, occurring in approximately 40 percent of all cases involving limbic epilepsy. This is due to the fact that limbic epilepsy is an episodic disorder and the EEG might be taken when an episode is not occurring. Although other methods of performing the EEG might have been more effective in the instant case, they were not used because they involved either serious discomfort to the patient, neurosurgery, or because the hospital was not equipped for performing the test.

Dr. Stipes also testified that prior to making his diagnosis he reviewed a discussion of the original work on episodic discontrol syndrome which is a relatively new discovery, having been noted or discovered in 1970. The usual manifestation of limbic epilepsy involves the appearance that the person is in a state of extreme rage. He will attack by confronting the other individual by both physical and verbal abuse, and by running or tearing apart the room or area in which he is located. His conversation will not appear to be rational or coherent and although the person would be able to understand what was going on, he would not have control over his behavior. A person suffering from an attack of limbic eipilepsy is not capable of performing a voluntary act.

In summarizing his own testimony, Dr. Stipes did acknowledge that he could not be absolutely sure that on October 19, 1977, the defendant was suffering from limbic epilepsy. However, he was not able to rule out the possibility that on October 19, 1977, that the defendant was suffering from limbic epilepsy. However, Dr. Stipes admitted that if the defendant

provided inaccurate or incorrect information, the doctor's diagnosis would necessarily suffer.

On cross-examination, Dr. Stipes did acknowledge that the EEG done in 1969 was not as reliable as the current EEG. Furthermore, he acknowledged that it cannot be assumed that the defendant's most current EEG was abnormal. Dr. Stipes, however, declined to state that, on the other hand, it was reasonable to assume that the defendant's current EEG was normal.

Dr. Stipes indicated that in addition to episodic discontrol syndrome as a possible cause of defendant's outbursts of violence, there were other possible causes for the sudden outbursts of violence, including a buildup of anger, extreme intoxication, antisocial personality, or the possibility, which Dr. Stipes thought unlikely, that the defendant was "acting out" in order to avoid the consequences of being called a "stoolie." There is no way of knowing if the defendant was insane on the date in question. However, despite these other possibilities, Dr. Stipes indicated that there remained a 40-percent chance that the defendant was suffering from episodic discontrol syndrome on October 19, 1977.

Dr. Stipes explained that defendant's rage could not be caused by pathological intoxication alone, since pathological intoxication is only a symptom of an organic brain syndrome such as episodic discontrol syndrome. Finally, Dr. Stipes acknowledged that he found the defendant to be a person of average intelligence, with little memory regarding the incidents involved in the case at bar, and he found no evidence that the defendant suffered from psychosis, schizophrenia, visual or auditory hallucinations, or any definable mental disease or defect other than possibly episodic discontrol syndrome.

Defendant's sister, Gwendolyn Holloway, testified that at 3 p.m. on October 19, 1977, she received a phone call from the defendant in which he told her that he was not feeling well, that he had a headache, and was worried that something might happen. He wanted her to come to the release center. She agreed, but she arrived at 4:30 p.m., after the incidents had already occurred.

Additionally, Ms. Holloway indicated that two previous incidents involving the defendant's having headaches and acting violently had occurred at her apartment. During the first of these incidents the defendant had been playing cards with his sister and others when he suddenly jumped up, ran out the front door and downstairs, shaking the back of his head with his hands. When he got downstairs, he and another tenant from the building got into a fight. The fight was, in turn, broken up by Mr. Holloway who brought the defendant back upstairs where his temples were massaged for 10 to 15 minutes to quiet him down. The second incident occurred when, after suffering from a headache, the

defendant again ran from Ms. Holloway's apartment holding his head. This time when he got outside he threw a garbage can through his sister's living room window. Both incidents occurred six or seven years prior to the incidents involved in the case at bar. However, she stated that she was positive that in neither of these episodes did the defendant have anything to drink.

Following Ms. Holloway's testimony, the defendant introduced into evidence a stipulation that Dr. Stipes, if recalled, would testify that in his opinion a person suffering from limbic epilepsy is legally insane only during the period of a seizure of limbic epilepsy. This concluded the defendant's case in chief, and the State presented no evidence in rebuttal.

■■ ■ The first issue raised by the defendant is whether the State's evidence was sufficient to overcome the affirmative defense of insanity. "A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1977, ch. 38, par. 6—2(a).) Once a defendant has presented evidence raising a reasonable doubt as to sanity, the burden shifts to the State to prove beyond a reasonable doubt that, at the time of the alleged crime, the defendant possessed the requisite mental capacity. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) As a general rule, the question of the defendant's sanity at the time of the offense is to be determined by the jury, and once that determination has been made, a court of review will not overturn that finding unless it is so manifestly against the weight of the evidence as to indicate the verdict was based on passion or prejudice (*People v. Ford* (1968), 39 Ill. 2d 318, 235 N.E.2d 576. See also *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6). The jury, as trier of fact, is not required to accept the psychiatrist's conclusion and may accept lay testimony over experts' testimony, giving weight to the expert's opinion based on the facts marshalled to support that opinion. (*People v. Kuhn* (1979), 68 Ill. App. 3d 59, 385 N.E.2d 388; *People v. Spears* (1978), 63 Ill. App. 3d 510, 380 N.E.2d 423.) The State may fulfill its burden by pointing out the weaknesses in the factual basis of the opinion of the defendant's expert. (See *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) The State is not required to introduce explicit opinion testimony of the defendant's sanity. (*People v. Young* (1978), 60 Ill. App. 3d 351, 376 N.E.2d 739.) One of the factors the jury could consider is to what extent the psychiatrist's diagnosis rests on information related by the defendant since self-serving or untruthful statements could affect the resultant diagnosis. *People v. Young* (1978), 60 Ill. App. 3d 351, 376 N.E.2d 739.

In the case at bar, the psychiatrist made a number of qualifying statements in regards to his belief as to the defendant's sanity on the date

in question. First, there was no way the doctor could determine the defendant's sanity on the date in question. Secondly, the diagnosis was based substantially on information provided by the defendant and his sister which, if incorrect, would admittedly affect the diagnosis. Thirdly, while a normal EEG did not rule out episodic discontrol syndrome completely, it reduced the probability that defendant was insane because in only approximately 40 percent of all cases involving limbic epilepsy did a negative EEG occur. And the psychiatrist agreed that there are a number of other possible explanations for the defendant's behavior.

Furthermore, in light of the psychiatrist's testimony and even though Kemp stated that the defendant talked incessantly and often made no sense and Johnson did not understand the reasons for the defendant's behavior and McDaniel did not consider the defendant's behavior normal, the jury could find from the evidence that the defendant had the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

Certainly, the fact that the defendant discontinued his criminal activity when the State trooper appeared supports the conclusion that he appreciated the criminality of his conduct and could conform his conduct to the requirements of the law. (See *People v. Elliott* (1975), 32 Ill. App. 3d 654, 336 N.E.2d 146.) In addition, the jury could have considered the defendant's attempt to flee after attacking Johnson as indicating the defendant appreciated the criminality of his conduct (See *People v. Moore* (1974), 19 Ill. App. 3d 334, 311 N.E.2d 401.) We cannot say, therefore, that the finding of sanity was against the manifest weight of the evidence.

A second issue is raised by the defendant concerning whether he was denied a meaningful election between the sentencing laws presently in effect and those in effect at the time he committed the offenses for which he was convicted. In electing to be sentenced under the old law, the defendant indicated that the defense counsel had explained the differences between the old and new codes. The defendant now complains that the trial court failed to inform him of the specific sentences to be imposed under each act, of the differences between parole eligibility under the old act and the early release provisions of the new act, and of the range of sentences available under the law in effect at the time of sentencing.

This precise issue was recently raised in *People v. Hackett* (1979), 77 Ill. App. 3d 877, 396 N.E.2d 827, wherein this court decided that where a defendant has discussed the alternatives with the defense counsel, in the absence of a contention of inadequacy of counsel or an indication in the record that the defendant misunderstood the consequences of his decision, no error will be ascribed to the failure of the trial court to inform

the defendant of the differences between the parole eligibility under the old law and the early release provisions of the new law or to inform the defendant of the range of sentences available under the law in effect at the time of sentencing or of specific sentences the trial court might have imposed. *People v. Peoples* (1979), 71 Ill. App. 3d 842, 390 N.E.2d 554.

Accordingly, the judgment of the Circuit Court of Will County is affirmed.

Affirmed.

STOUDER, P. J., and BARRY, J., concur.