THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DAVID W. BEEHN, Defendant-Appellant.
Fourth District   No. 4—90—0366

Opinion filed November 29, 1990.

STEIGMANN, J., specially concurring.

Daniel D. Yuhas and Judith L. Libby, both of State Appellate Defender's
Office, of Springfield, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Kenneth R.
Boyle and Robert J. Biderman, both of State's Attorneys Appellate Prose-
cutor's Office, of counsel), for the People.

JUSTICE SPITZ delivered the opinion of the court:
Following a consolidated, stipulated bench trial conducted in the
circuit court of McLean County, the defendant David W. Beehn was
found guilty but mentally ill (GBMI) of the offenses of burglary, crim-
inal damage to property having a value in excess of $300, and the
aggravated battery of a correctional officer. (Ill. Rev. Stat. 1989, ch.
38, pars. 19—1, 21—1, 12—4(b)(6).) Defendant was sentenced to con-
current terms of imprisonment of three years for each offense.

On appeal, defendant challenges only his convictions for burglary and criminal damage to property, defendant's appeal from the aggravated battery conviction having been dismissed on defendant's motion (case No. 4—90—0367). Defendant argues the finding of GBMI is inappropriate, contending that the evidence requires a finding that defendant was not guilty by reason of insanity.

The stipulated facts pertaining to the convictions being appealed are these. Helen Behary would testify that on November 6, 1989, at about 9:30 a.m. she was at her residence at 305 Garfield in Bloomington with her daughter. She was in the kitchen when she heard a loud banging at the front door. She looked at the front door and saw it being kicked by a white male wearing a light-colored shirt. After calling the police using the 911 emergency number, she went to the front door and looked out the window next to the door. She recognized the white male as the defendant.

The defendant was screaming and yelling. He had a cross in his hand. Behary asked the defendant what was wrong and what he wanted. The defendant replied, "Come with me and show me where Mike is." The defendant said, "Get dressed you bitch and you have to come with me and show me where Mike is." The defendant threatened to kill Behary if she did not go with him and continued kicking the door.

Behary left the front door and met her daughter in the hallway. She suggested leaving through the bathroom window. The daughter said they should leave through the back door, which they did.

After the arrival of the police at the scene, Behary returned to her house to find that the front storm door and regular door had been kicked in and damaged. The microwave had been pushed into the wall, making a large hole. Dishes were broken on the floor. A pair of her eyeglasses had been broken.

In other rooms in the house, boxes had been tipped over and, in the bedroom, the letters "LG" had been written on the mirror with wax. She believes those letters stand for "Little God."

Behary would further testify she at no time gave the defendant permission to enter her home or to damage any items in her home. Furthermore, she would testify as to the amount of damages.

Next, Officer Bauer would testify that on November 6, 1989, he was in uniform and on duty as a patrolman for the Bloomington, Illinois, police department. He was dispatched to the location regarding a burglary in progress.

Upon arrival at the house, Bauer heard a crash from inside the house. As he moved closer to the house, he saw the front door had

been damaged and was broken in several places. As Bauer got to the door, the defendant came out of the house with a cross in his left hand and a rolled-up pad of yellow paper in his right hand. The defendant told the officer his name was David Beehn. The defendant was asked if he lived at this address and he responded no, that Helen Behary did. Bauer told the defendant to turn around and place his hands on the wall. The defendant turned and, with both hands, knocked the screen out of the storm door. After knocking the screen out, the defendant held the door frame with both hands and refused to release the door upon being requested to do so. The defendant was asked three times to place his hands behind his back and, upon the third refusal, was removed from the door and held on the ground until Bauer's backup could arrive.

While being held on the ground, the defendant kept saying, "We are the children of the world." The defendant also repeated the Lord's Prayer and made other religious statements. The defendant continued to hold the cross and notepad.

Officer Rhoda arrived at the scene and the defendant was hand-cuffed. Once handcuffed, the defendant seemed to calm down. Bauer observed damage to both the storm door and the regular door. The microwave oven and radio were thrown from the counter top to the floor of the kitchen. There was a hole in the wall across the hallway from the counter top, apparently caused by being struck by the microwave.

Officer John Rhoda's testimony in this cause would be that on November 6, 1989, he was in uniform and on duty as a patrolman for the Bloomington police department. Rhoda was dispatched to assist Bauer. Upon arrival, he saw Bauer restraining defendant. The defendant was holding a cross in one hand and a notepad in the other. The defendant was continuously making religious comments. The defendant told Rhoda he was God and that he had to kill Satan. The defendant said he had been reborn after each of two suicide attempts.

The defendant was transported to the Bloomington police department. Upon arrival, he suddenly quit talking religion and wanted to know what was going to happen to him. The defendant stated that he would see a judge and get out today. The defendant asked to go to Brokaw Hospital and be evaluated, saying that it was his right. The defendant would not state he had any problems, but he wanted to be evaluated. The Department of Mental Health had already been called to evaluate the defendant. People's exhibit No. 3 consisted of 28 pages, apparently from the pad of paper, with a handwritten mes-

sage repeatedly declaring the writer's love for Michael Behary.

The defense then presented, by stipulation, the testimony of Dr. Robert E. Chapman, a psychiatrist licensed to practice in the State of Illinois, to the effect that Chapman had examined defendant on January 12, 1990, and prepared a written report dated January 22, 1990, which contained his findings, diagnosis, and the basis for his opinion. The report was admitted as defendant's exhibit No. 1. Although the report will not be quoted in its entirety, significant portions of it must be related in order to understand the arguments on appeal.

"PSYCHIATRIC HISTORY: He was in Brokaw Hospital Psychiatric Unit three times under the care of Dr. Baker and Dr. Bey. Hospital records show a primary diagnosis of Schizoaffective Disorder. He said the reason he was hospitalized was because of mental confusion and he was paranoid. He said his parents were in Florida and he 'went to Helen Behary's and she gave me two pills and called the doctor.'

He has had two suicide attempts. First was the summer of 1988 when he overdosed with the medicine from the home bathroom medicine cabinet. His father called the emergency squad and they took him to Brokaw to the Intensive Care Unit. The second time was while on the Psychiatric Intensive Care Unit at Brokaw Hospital he took a nail from his religious cross and cut his left wrist.

DEFENDANT'S VERSION OF THE BURGLARY AND CRIMINAL DAMAGE TO PROPERTY: 'I just wanted a peace treaty at the Saltwater Summitt. I went there about 9 a.m. to get her and Mike to sit down and talk about what they wanted from me. Mike was living at Brad Koch's house. I took my cross with me. I knocked on the door, she came to the window and I asked for Mike. I wanted her to show me where he was. She said something, I can't remember too much after that. I love Mike Behary as a friend. I'm going to be a father to a son or a son to a father, I don't know which.'

He said he sees Mrs. Behary as the devil controlling others and having others do things to drive him crazy and kill him. For example, she had her daughter put on makeup, called Mike's roommate and caused him to do peculiar things, etc.

\* \* \*

MENTAL STATUS EXAMINATION: He was vague, mildly confused with poor concentration. He showed delusional thinking, flat affect, difficulty holding attention, tangential

thoughts, loose association of thought, irrelevant comments, and poor short-term memory. He denied hearing voices but stated, 'People watch me and talk about what I do or say. Sometimes I can't hear them but I believe they are talking about me. I hate nigger dope dealers, they and the communists are to destroy this country. I can see what's coming, females turning into males and homosexuality to destroy America. Blacks are taking over all the white women.' His thought content was at times bizarre and difficult to comprehend.

SUMMARY OF PSYCHOLOGICAL TESTING: The Minnesota Multiphasic Personality Inventory showed him to be quite angry and depressed. He does not accept full responsibility for his low mood instead blaming others for working against him. It shows evidence of poor memory, concentration problems and inability to make decisions. It shows he feels that life is no longer worth while and that he is losing control of his thought processes. He feels estranged from people, somewhat alienated and concerned over the action of others and may tend to blame others for his negative frame of mind. His responses showed a number of extreme and bizarre thoughts suggesting a presence of delusions and or hallucinations. He apparently believes that he has special mystical powers or a special 'mission' in life which others do not understand or accept.

PSYCHIATRIC DIAGNOSIS: Schizo-affective Disorder with Paranoid features.

OPINION: It is my opinion given with a reasonable degree of medical and psychiatric certainty based on information available to me and examination of the Defendant, David William Beehn, that on November 6, 1989, and while at 305 Garfield Drive, Bloomington, Illinois, and during the time he allegedly committed the offense of Criminal Damage to Property over $300 and the offense of Residential Burglary he was suffering from Schizo-affective Disorder with Paranoid features to such a degree as to substantially impair his capacity to appreciate the criminality of his behavior.

It is further my opinion that on November 7, 1989, while he was incarcerated at McLean County Jail, Bloomington, Illinois, and at the time that he allegedly committed the offense of Aggravated Battery, he was suffering from the mental disease of Schizo-affective Disorder with Paranoid features. This caused his mental state to be such as to irrationally fear for his welfare and life and to misinterpret the action of others to

such a degree as to substantially impair his capacity to appreciate the criminality of his behavior.

DISCUSSION: During the period of time of the above cited events, David Beehn was suffering from the mental disease of Schizo-affective Disorder with Paranoid features. This caused him to experience delusional thinking, to misinterpret his environment, to believe and hold with great emotion, the fear of being driven crazy, killed and that he possesses magical powers and [is] on an important religious mission to counter threats against him. These symptoms substantially impaired his judgment, his self control and an appreciation of how his behavior affected other people. This substantial disorder of thought and mood, colored, influenced and guided his life, thought, moods and behavior."

No rebuttal evidence was presented by the State.

■ With respect to the effect of insanity on criminal responsibility, section 6—2 of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 6—2) states, in relevant part:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) A person who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill.

(d) For purposes of this Section, 'mental illness' or 'mentally ill' means a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law.

(e) When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by a preponderance of the evidence that the defendant is not guilty by reason of insanity. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of

the elements of each of the offenses charged ***."
Unless it is contrary to the manifest weight of the evidence, the fact finder's resolution of the issue of defendant's sanity at the time of the offense will not be disturbed on appeal. *People v. Martin* (1988), 166 Ill. App. 3d 428, 519 N.E.2d 1085; *People v. Janecek* (1989), 185 Ill. App. 3d 89, 540 N.E.2d 1139.

In this case, the defendant contends that the trial court must accept the psychiatrist's conclusions because there is absolutely no other evidence before the trial court from which a contrary conclusion could be found. The State disagrees.

The State's argument starts with the presumption that all persons are presumed sane. (See *People v. Young* (1978), 60 Ill. App. 3d 351, 376 N.E.2d 739.) The State then proceeds to argue that the trial court need not accept the psychiatrist's opinion of defendant's insanity at the time of the offense when there are other facts before the court which cast doubt on the psychiatrist's conclusions. For example, in *People v. Marshall* (1983), 114 Ill. App. 3d 217, 448 N.E.2d 969, this court concluded the expert's opinion did not preclude the trial court from finding defendant to be sane at the time of the offense based on the testimony of lay witnesses about defendant's demeanor and conduct on the day she fatally shot her brother and on the expert's own testimony that defendant's mental illness would not be a primary operative factor in the shooting if he in fact had a wrench in his hand as she claimed. However, in *Marshall*, the testimony of the psychiatrist raised serious doubts. The psychiatrist testified that a paranoid delusion on the part of defendant that her brother posed a threat to her was only one of three possible explanations for the shooting. According to the psychiatrist, the defendant knew it was against the law to shoot people except in self-defense, but she felt she was not breaking the law because she was acting in self-defense. The psychiatrist also implied that defendant simply did not care about the law, rather than lacking the capacity to conform her conduct to the requirements of the law.

The State further suggests that less weight may be given to the psychiatrist's report because it is based on information related by the defendant which may be self-serving and untruthful and which could affect the diagnosis. In support of this proposition, the State cites *People v. Spears* (1978), 63 Ill. App. 3d 510, 380 N.E.2d 423, and *People v. Romaine* (1979), 79 Ill. App. 3d 1089, 399 N.E.2d 319. Both cases hold that the State need not present expert opinion testimony of defendant's sanity, but may rely on weaknesses in the factual basis of the opinion of the accused's expert. However, in neither of those

cases was that fact the sole reason relied on by the appellate court to uphold the finding of sanity. In *Romaine* and *Spears* the psychiatrists made a number of qualifying statements regarding the belief of the respective defendants' insanity. Furthermore, in both cases there was testimony by lay witnesses which the trier of fact could resort to as assistance in finding the defendant to be sane at the time of the offense.

In this case, the tactical decision to proceed on a stipulated trial where the defense of insanity is raised is drawn into question. The psychiatrist could not be cross-examined and no rebuttal witnesses were available to testify.

■ Nevertheless, the State argues there were facts before the trial court on which the trial court could rely in rejecting the expert's opinion of insanity. The State, after conceding that defendant at times engaged in some unusual behavior, argues that at other times defendant appeared lucid and coherent. For example, defendant was able to tell Bauer who lived at the house. After arriving at the police station, defendant stopped talking religion and asked what was going to happen to him. He anticipated going before a judge, and stated he had a right to be evaluated and wanted to go to the hospital.

The State points out that the fact defendant appeared coherent and normal in behavior shortly after the incident is a factor the trial court could have considered in determining whether to rely on the psychiatrist's report. (See *Martin,* 166 Ill. App. 3d 428, 519 N.E.2d 1085.) In addition, the State contends the trial court could consider the circumstances surrounding the psychiatrist's examination of defendant, such as the length of time between the incident and the examination, the extent to which the diagnosis was based on defendant's statements, and whether defendant was aware of the purpose of the examination and that the findings would be available for use at trial. The State points out that Chapman did not examine this defendant until over two months after the incident. The State contends Chapman relied primarily on defendant's statements. Chapman's report indicates defendant stated "I believe I committed a crime" and further indicates defendant's understanding that the psychiatrist's report would be available to the court and that the psychiatrist could be called upon to testify. The State also argues the ceasing of criminal conduct by defendant when the police arrived should also be considered in determining defendant's sanity at the time of the offense.

This court agrees with the State that there exist sufficient facts in the record from which the trial court could reasonably find defendant was sane at the time of the commission of the offense in question.

Accordingly, the judgment of the circuit court of McLean County is affirmed.

Affirmed.

McCULLOUGH, J., concurs.

JUSTICE STEIGMANN, specially concurring:

While I concur in the judgment of the majority affirming defendant's conviction, I do not agree with its reasoning. In my opinion, an incorrect standard of review has been employed by the majority. Accordingly, I specially concur.

Even though both the State and the defense cite *People v. Martin* (1988), 166 Ill. App. 3d 428, 519 N.E.2d 1085, and this court's decision in *People v. Janecek* (1989), 185 Ill. App. 3d 89, 540 N.E.2d 1139, for the proposition that the fact finder's resolution of the issue of defendant's sanity at the time of the offense will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence, this standard is no longer valid with regard to insanity cases. Subsection (e) was added to section 6—2 of the Code by Public Act 83—288, effective January 1, 1984. (Pub. Act 83—288, §1, eff. Jan. 1, 1984 (1983 Ill. Laws 2035).) The addition of that subsection eliminated the requirement, in cases in which the insanity defense has been raised, that the State must prove beyond a reasonable doubt that the defendant was not insane; instead, subsection (e) now provides that the burden is on the defendant to prove by a preponderance of the evidence that he is not guilty by reason of insanity.

The standard of review of a finding that the defendant was not insane, as discussed in *Martin* and *Janecek*, is premised upon earlier decisions, which in turn are premised upon section 6—2 of the Code prior to its 1984 amendment. For instance, in holding that the fact finder's resolution regarding defendant's insanity will not be disturbed unless it is contrary to the manifest weight of the evidence, this court in *Janecek* cites only *Martin* in support. (*Janecek*, 185 Ill. App. 3d at 93, 540 N.E.2d at 1142.) *Martin* in turn cites *People v. Teague* (1982), 108 Ill. App. 3d 891, 439 N.E.2d 1066, in support of that same standard of review. (*Martin*, 166 Ill. App. 3d at 433, 519 N.E.2d at 1088.) *Teague*, however, was a 1982 appellate court opinion arising from a 1977 conviction of various felony counts. At the time *Teague* was decided, subsection (e) had not yet been added to section 6—2 of the Code.

The defendant's burden under subsection (e) of section 6—2 of

proving by a preponderance of the evidence that he is not guilty by reason of insanity is the burden applicable in civil proceedings; when reviewing determinations by a trier of fact that a defendant who asserted the insanity defense failed to meet that burden of proof, appellate courts should apply the standard of review applicable to civil cases. The Third District Appellate Court correctly stated that civil standard of review as follows: "It is not our position to question the wisdom of a jury's verdict unless the defendant is entitled to a directed verdict or judgment *n.o.v.* under the *Pedrick* [*v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504] standard." (*Spring v. Toledo, Peoria & Western R.R. Co.* (1976), 44 Ill. App. 3d 3, 11, 357 N.E.2d 1330, 1336, *aff'd* (1977), 69 Ill. 2d 290, 371 N.E.2d 621.) The Third District Appellate Court in *Spring* also said the following:

> "Both parties agree that the standard for determining whether a directed verdict or a judgment *n.o.v.* should be given is established in *Pedrick* [citation]. This oft cited case requires a directed verdict or judgment *n.o.v.* to be entered 'only in those cases in which all of the evidence, when viewed in its aspects most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' (37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.)" *Spring*, 44 Ill. App. 3d at 10, 357 N.E.2d at 1335.

The foregoing standard should be applied to the present case as this court considers whether defendant proved by preponderance of the evidence that he was not guilty by reason of insanity. When all the evidence is viewed in its aspect most favorable to the prosecution, I conclude that it cannot be said the evidence so overwhelmingly favors defendant's argument that he was insane that no contrary verdict based upon this evidence regarding defendant's insanity could ever stand.