THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDREW M. ASPELMEIER, Defendant-Appellant.
Third District No. 3—92—0884

Opinion filed September 10, 1993.

Winstein, Kavensky & Wallace, of Rock Island (Arthur R. Winstein, of counsel), for appellant.

Marshall E. Douglas, State's Attorney, of Rock Island (John X. Breslin and Judith Z. Kelly, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SLATER delivered the opinion of the court:

Defendant Andrew Aspelmeier was charged with two counts of first degree murder in the deaths of Tracy Rutherford and Arlene Aspelmeier. Following a bench trial, the defendant was found guilty but mentally ill (see Ill. Rev. Stat. 1991, ch. 38, par. 115—3(c)) on both counts and he was sentenced to two concurrent terms of natural life imprisonment. On appeal, the defendant contends that the trial court's determination that he was legally sane at the time the offenses were committed was against the manifest weight of the evidence. We affirm.

The evidence presented at trial showed that on February 28, 1992, the defendant and his girlfriend, Tracy Rutherford, along with Rutherford's 21-month-old son, went to the home of defendant's mother, Arlene Aspelmeier, in East Moline, Illinois. The defendant had recently borrowed $2,700 from his father and was planning on moving to California. While at his mother's home, the defendant came to believe that Rutherford and his mother were conspiring against him, apparently to take the money. Shortly after his mother had given him some mail, the defendant shot his mother in the head with a shotgun. The defendant then shot Rutherford twice in the head as she was talking on the telephone. The defendant took Rutherford's son down into the basement of the home, along with a handgun, until he determined that no one was coming. Defendant and the child then drove around for a while, until he

dropped the boy off the next morning at the home of George and Marjorie Liebengood, Rutherford's grandparents. Mr. Liebengood twice asked the defendant where Rutherford was, and defendant told him that she was with his mother. Defendant also told Liebengood that he was involved in a money "scam" and he was going to turn himself in to the police. According to Liebengood's trial testimony, the defendant appeared to be normal. He was not easily distracted, nor did he speak rapidly or jump from topic to topic. Liebengood had given a statement to police on March 2, 1992, however, in which he stated that defendant appeared abnormal, as if he was in shock, and his responses to questions were strange and unusual. In addition, police officer Joseph Reedy testified that Liebengood called the East Moline police department and reported that defendant had made a strange statement to him.

Judy Scharer, an East Moline police dispatcher, testified that the defendant arrived alone at the police station at 7:45 a.m. on Saturday, February 29, and asked to speak to someone. He did not appear to be easily distracted, speak rapidly or skip from topic to topic. On cross-examination, Scharer agreed that when the defendant entered the police station he appeared to be somewhat confused.

Officer Reedy next spoke with the defendant, who told him he had been involved in a scam that had cost the lives of two people. The defendant told Reedy that he had borrowed money from his father, left the money at his mother's house, and when he returned there with his girlfriend, the money was missing. After his mother gave him some mail, the defendant loaded a shotgun and shot both his mother and Tracy Rutherford. A tape-recorded statement was taken from the defendant by Reedy, which was played in open court. Reedy testified that the defendant appeared calm and quiet. He did not seem distracted, nor did he speak rapidly or switch from topic to topic. Defendant was responsive to questions and able to express himself. He did not complain of tension or that his mind was about to explode. Reedy found it unusual, however, that the defendant could not remember the address of the apartment where he and Tracy Rutherford had lived for a year and a half.

Police officer Corey Fulton was dispatched to Arlene Aspelmeier's home, where he found the bodies of the victims. Prior to leaving the police station, Fulton spoke with the defendant and asked for permission to search the home. The defendant responded that he did not know if he could give permission because, although he had been staying there, he did not own the house. According to

Fulton, the defendant was coherent, articulate, and able to respond to questions.

Police officer Richard Scott also interviewed the defendant on February 29 and took two taped statements from the defendant, which were played to the trial judge. According to Scott, the defendant was quiet and unemotional and he would think about his answers before giving them. Defendant did not seem distracted, nor did he speak rapidly, jump from topic to topic, or complain that his mind was about to explode. Scott acknowledged on cross-examination, however, that he found the defendant's "laid back" attitude unusual. Two jailers at the Rock Island County jail where the defendant was being held also testified that the defendant was quiet and slept a lot.

The defendant presented the testimony of Dr. Robert Chapman, a psychiatrist, who examined the defendant on July 31, 1992, at the State's request for the purpose of determining sanity. Chapman interviewed the defendant for two hours and gave him a psychological test. Chapman also relied upon police reports, copies of the statements defendant gave to Officers Scott and Reedy, and the report of Dr. Eric Ritterhoff, who had examined the defendant in early March and several times in May. Although Ritterhoff's report was not entered into evidence, testimony was elicited that Ritterhoff had diagnosed the defendant as suffering from paranoid delusional disorder. Ritterhoff's report did not state an opinion concerning whether or not the defendant could appreciate the criminality of his conduct. Chapman testified that he and Ritterhoff agreed that the defendant was suffering from a severe mental disease and a state of psychosis; they differed only in their classification of defendant's condition. Chapman's diagnosis was that defendant had suffered from an acute manic psychosis, which lasted from approximately three days before February 28 until approximately 1 or 1½ weeks afterward. The defendant then went into spontaneous remission and his symptoms abated. It was Chapman's opinion that on February 28 the defendant lacked the capacity to appreciate the criminality of his behavior.

On cross-examination, Chapman acknowledged that the psychological test he administered to the defendant, although of marginal validity because the defendant attempted to place himself in an overly positive light, revealed that the defendant's personality profile was within normal limits. Chapman also agreed that the Diagnostic and Statistical Manual III (DSM-III) listed inflated self-esteem or grandiosity, decreased need for sleep, talkativeness, flight

of ideas, distractibility, and excess involvement in pleasurable activities as criteria for a diagnosis of a manic episode. He acknowledged that manic speech is typically loud, rapid and difficult to interpret, may jump from topic to topic and is sometimes unresponsive. Chapman admitted that Ritterhoff had evaluated the defendant during the first week of March, when defendant was still in his manic episode, but had not diagnosed acute manic psychosis. Chapman also agreed that the duration of a manic episode averages about four months, while the defendant's episode lasted only two weeks. Finally, Chapman acknowledged that much of the basis for his diagnosis was the defendant's statements that his mind was racing, his thinking was jumping from topic to topic and he felt that his mind would explode.

In announcing its judgment, the trial court stated that it had listened to the three taped statements given by the defendant and it found that defendant was clear, coherent, precise, reflective and he was able to tell the police exactly what he had done. There was no indication that the defendant's mind was jumping from topic to topic or was unfocused. The court noted that the tapes corroborated the police officers' observations that defendant was coherent, responsive and had a clear understanding of the facts surrounding the killings. The court also thought that the defendant's answer to Officer Fulton's request to search the house suggested that the defendant was "able to be concerned about right and wrong [and] understand the legality of matters before him." The court summarized the findings of the two doctors, noting that the defendant's conduct as related in his taped statements and by the observations of the witnesses did not appear to meet the criteria for a diagnosis of acute manic psychosis. The court also pointed out that Dr. Ritterhoff saw the defendant while he would have been in a manic state and yet he failed to recognize it. The court noted that Dr. Chapman's diagnosis largely relied upon the defendant's subjective statements and that the psychological testing of the defendant did not support Chapman's diagnosis. Finally, the court stated:

> "I think a person has to be extremely mentally ill not to appreciate [that] killing his mother is wrong or criminal. \*\*\* I do not believe the defense of insanity is proved by the preponderance of the evidence. In my mind after listening to the evidence as a whole I really think he's sane beyond a reasonable doubt. Very mentally ill but never the less sane."

Defendant contends that the trial court's finding of sanity was against the manifest weight of the evidence. The defendant argues

that the trial court disregarded the uncontradicted opinion of Dr. Chapman that he was insane, as well as the supporting testimony of other witnesses that defendant appeared confused, unusually "laid back" and abnormal shortly after the killings. Defendant also maintains that the trial court's statement quoted above indicates that the court required the defendant to prove that he was *extremely* mentally ill, an improper and higher standard of proof than that required by law.

Section 6—2 of the Criminal Code of 1961 (the Code) provides in part:

> "Insanity. (a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
>
> \*\*\*
>
> (c) A person who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill.
>
> (d) For purposes of this Section, 'mental illness' or 'mentally ill' means a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law." Ill. Rev. Stat. 1991, ch. 38, par. 6—2.

When a defendant raises the affirmative defense of insanity, he bears the burden of proving, by a preponderance of the evidence, that he was legally insane at the time of the offense. (*People v. Thurman* (1991), 223 Ill. App. 3d 196, 584 N.E.2d 1069; Ill. Rev. Stat. 1991, ch. 38, par. 6—2(e).) The fact finder's determination of the defendant's sanity will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. (*People v. Beehn* (1990), 205 Ill. App. 3d 533, 563 N.E.2d 1207.) The weight to be given an expert's opinion on sanity depends upon the reasoning and factual details used to support that opinion (*People v. Glenn* (1992), 233 Ill. App. 3d 666, 599 N.E.2d 1220) and a court may consider the length of time between the incident and the expert's examination of the defendant, as well as the extent to which the diagnosis was based on the defendant's statements (see *Beehn*, 205 Ill. App.

3d 533, 563 N.E.2d 1207). A trier of fact may reject all expert testimony and conclude that a defendant was sane based solely on lay testimony; lay opinions are particularly relevant if they are based on observations made shortly before or after the crimes were committed. *People v. West* (1992), 231 Ill. App. 3d 646, 596 N.E.2d 740.

. In this case the trial court rejected Dr. Chapman's diagnosis, finding that it was largely based on the defendant's subjective statements, that it was not supported by the psychological testing and that it was inconsistent with the testimony of the witnesses who observed the defendant shortly after the killings. The court also noted that the defendant's taped statements corroborated the lay witnesses' descriptions of defendant as coherent and responsive to questions. While there was some evidence that defendant appeared abnormal, confused or unusually calm, the majority of the lay testimony supported the trial court's determination that the defendant had failed to prove he was insane. We hold that the trial court's decision was not against the manifest weight of the evidence.

We also reject the defendant's argument that the trial court's isolated comment that a person would have to be extremely mentally ill not to appreciate that killing his mother is wrong indicates that the court misunderstood or misapplied the burden of proof. Our review of the court's detailed findings, consisting of more than 20 pages of transcript, shows that the court carefully analyzed both the facts and the law. The court twice stated that the defendant had the burden of proving his insanity by a preponderance of the evidence. The court also noted that the Code defines insanity as "when at the time of the conduct as a result of a mental disease or mental defect the [d]efendant lacks substantial capacity either to one, appreciate the criminality of his conduct or two, conform his conduct to the requirements of the law." We find that the record shows that the court understood and properly applied the law in reaching its decision.

For the reasons stated above, the judgment of the circuit court is affirmed.

Affirmed.

McCUSKEY, P.J., and BARRY, J., concur.